# NESTA JAMES, Appellant/Defendant
## v.
# PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff

S. Ct. Criminal No. 2011-0032

Supreme Court of the Virgin Islands

October 4, 2013

G. ALAN TEAGUE, ESQ., Law Offices of G. Alan Teague, P.C., St. Thomas, USVI, *Attorney for Appellant*.

PAMELA R. TEPPER, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.*

## OPINION OF THE COURT

(October 4, 2013)

SWAN, *Associate Justice.* Appellant, Nesta James, was convicted of several crimes, including aiding and abetting first degree murder. James appeals the Judgment and Commitment entered by the trial court on June 28, 2011, and likewise appeals other orders denying his motions, including a Rule 29 Motion for Judgment of Acquittal. We affirm the Superior Court's Judgment and Commitment.

## I. FACTS AND PROCEDURAL HISTORY

James and Denalson "Flex" Merrifield ("Merrifield"), co-defendants at trial, were charged with aiding and abetting each other in the murder of Tameka "Crucian" Edwards whose body was found on August 23, 2009 in Estate Contant on St. Thomas. The salient facts surrounding Edwards' death are as follows.

Late at night on August 21, 2009 or early morning of August 22, 2009, Edwards, Jesse Smalls ("Smalls"), Myoshi McClean ("McClean"), and Symore Brown ("Brown") went to Club Lexus ("Club") in the area of Estate Smith Bay on St. Thomas. After taking McClean to the Club, Brown departed but returned later and waited inside his vehicle in the Club's parking lot for McClean to complete her shift as a bartender in the establishment. While waiting, Brown heard shots being discharged and left his vehicle to investigate what was occurring and immediately encountered McClean holding Smalls, who had been shot and had died. (J.A. at 463.)

After the shooting and while at the Club, Edwards gave a statement to police regarding her observation of the circumstances surrounding Smalls' death. According to Edwards' statement, she was sitting with Smalls outside the Club when Smalls stated that he was feeling "bad vibes," after observing approximately five males similarly attired congregating in the area. (J.A. at 999-1000.) Edwards left the immediate area where they were sitting, after discovering that Smalls had a firearm.

As Edwards was returning to the Club, the five men Smalls had referenced earlier walked past Edwards. Thereafter, shots were fired, and Edwards ran towards the Club. (J.A. at 1000.)

Police officers arrived on the scene immediately after the shooting, and instructed all persons in the area to leave the scene, including McClean, who had been holding Smalls' lifeless body. (J.A. at 463.) McClean and Brown immediately left the area in Brown's vehicle. On their trip home, McClean sent text messages to James and Merrifield informing them that Smalls had been shot and had died. (J.A. at 463.) James and Merrifield lived in the same neighborhood as McClean and were close friends with Smalls. Before arriving at McClean's apartment, McClean and Brown stopped at the home of Smalls' parents, who also lived in the same neighborhood, to inform them of Smalls' death. (J.A. at 465.)

After leaving the home of Smalls' parents, McClean and Brown went to McClean's apartment. (J.A. at 468.) Shortly after they arrived, Merrifield knocked on McClean's door and said "Jesse is dead" and continued with: "Wait till Lion gets here, wait till Lion gets here" and that when Lion got there it was "going to be on." (J.A. at 468.) "Lion" is James' sobriquet. Merrifield left McClean's house and returned shortly thereafter with James, who was visibly distraught and crying. (J.A. at 468.) At this time, James brandished a handgun and inquired about the circumstances surrounding Smalls' death, simultaneously accusing McClean and Edwards of "setting up" Smalls. (J.A. at 468-469.) James repeatedly asked McClean where "the Crucian girl" was, referring to Edwards. (J.A. at 469.) During this encounter, Merrifield instantaneously reiterated parts of what James was saying to McClean. (J.A. at 470.) McClean assured James that she knew nothing of Edwards' whereabouts. (*Id.*)

James and Merrifield left the immediate area but returned shortly after with James in possession of a weapon similar to an AK-74 assault rifle, which had a sheet or a pillow case wrapped around it. (J.A. at 472.) James again left the immediate area and returned a third time with a different individual. (J.A. at 473.) Merrifield was not present at this time. (*Id.*) McClean then called her landlord, Beatrice Flemming ("Flemming"), and told her that James and Merrifield came to her door and that James possessed guns and was threatening to kill her and Edwards. (J.A. at 474.) Flemming advised McClean to leave the Estate Contant area. (J.A. at

474.) McClean and Brown left Estate Contant and went to the Paradise Point Tramway in Estate Havensight. (J.A. at 475.)

While these events were occurring, Edwards was still at the Club. Detective Jason Marsh, one of the officers dispatched to the crime scene took Edwards to the police station and obtained a statement from her. After giving the statement and informing Detective Marsh that she needed to return to work, Edwards was transported from the police station to the Club. Later that morning, Alpheus Lettsome ("Lettsome"), who was also at the Club that night, gave Edwards a ride in his truck to McClean's home, where Edwards frequently stayed. After Edwards exited Lettsome's truck but before he was able to leave the area, someone with a gun approached Lettsome's truck and told him, "don't move." (J.A. at 689.) Lettsome, who was sitting in his truck, was only able to see a rifle, which he described as having a pillow case or sheet tied around it. (J.A. at 690.) This encounter occurred sometime in the early morning hours on August 22, 2009. Lettsome saw only one person and hurriedly departed the area as the person with the rifle discharged shots at his truck. (J.A. at 692.) One of the shots penetrated the truck and grazed Lettsome's leg. (J.A. at 691.)

When McLean and Brown returned home at approximately 1:00 p.m. the following day, August 23, 2011, they encountered Edwards' dead body in their back yard. (J.A. at 476.) There was a cellular telephone, which was not owned by either McClean or Brown, plugged into an electrical outlet on the back porch of their apartment. At trial, McClean testified that James often plugged his cell phone into the same wall outlet to charge it. (J.A. at 476.) McClean contends that the cell phone had not been on the back porch when she and Brown left the house the previous day. McClean immediately called the police. (J.A. at 490.)

On August 27, 2009, Dr. Francisco Landron, the Medical Examiner for the Virgin Islands, performed an autopsy on Edwards' body and concluded that she died from multiple gunshot wounds. A firearms examiner concluded that the bullets found in Edwards' body were likely discharged from an AK-74 assault rifle. (J.A. at 675-76.)

On January 5, 2010, the People of the Virgin Islands charged James, Merrifield and another individual, Junnie Etienne, in a twenty-seven count Information with crimes associated with the death of Edwards. At the beginning of the trial, the People moved to dismiss the case against Etienne without prejudice because of the People's inability to prove the

case against him beyond a reasonable doubt. (*J.A.* at 395.) The trial court granted the motion to dismiss that case without prejudice. The People then filed an eighteen count Third Amended Information listing James and Merrifield as defendants in the Information. (J.A. at 89-95.)

The Information charged James with murder in the first degree, in violation of 14 V.I.C. §§ 921, 922(a)(1); 14 V.I.C.§ 11(a) (Count X); unauthorized possession of a firearm during the commission or attempted commission of a crime of violence — murder in the first degree in violation of 14 V.I.C. § 2253(a); 14 V.I.C. § 11(a) (Count XI); assault in the first degree, in violation of 14 V.I.C. § 295(1): 14 V.I.C. § 11(a) (Count XII); unauthorized possession or use of a firearm during the commission or attempted commission of a crime of violence — assault in the first degree, in violation of 14 V.I.C.§ 2253(a): 14 V.I.C. § 11(a) (Count XIII); attempted murder in the first degree in violation of 14 V.I.C. §§ 921, 922(a)(1); 14 V.I.C. § 11(a) (Count XIV); unauthorized possession or use of a firearm during the commission or attempted commission of a crime of violence — attempted murder in the first degree, in violation of 14 V.I.C. § 2253(a); 14 V.I.C. § 11(a) (Count XV); assault in the third degree, in violation of 14 V.I.C. § 297(2); 14 V.I.C. § 11(a) (Count XVI); unauthorized possession or use of a firearm during the commission or attempted commission of a crime of violence — assault in the third degree, in violation of 14 V.I.C. § 2253(a); 14 V.I.C. § 11(a) (Count XVII); and reckless endangerment in the first degree, in violation of 14 V.I.C. § 625(a); 14 V.I.C. § 11(a) (Count XVIII).

The trial commenced on January 19, 2011 with charges against both James and Merrifield. At the close of the People's case, the defense made a Motion for Judgment of Acquittal under Rule 29 of the Federal Rules of Criminal Procedure and Superior Court Rule 7. The motion was denied. The defense renewed the motion at the close of the defense's case. The trial judge again denied the motion and allowed the case to go to the jury on all charges as to both defendants. Following deliberations, the jury returned verdicts finding James guilty of counts ten through thirteen and not guilty of counts fourteen through eighteen. (*Id.*) After the verdicts, the defense again motioned the trial court for a Rule 29 Judgment of Acquittal, and also moved for a mistrial or alternatively a new trial. (J.A. at 1315-16.) The trial court permitted defense counsel to submit the arguments in writing. (J.A. at 1317.) During the sentencing hearing, the

trial court again denied James' Rule 29 Motion for Judgment of Acquittal. This timely appeal ensued.

## II. JURISDICTION

Title 4, section 32(a) provides that "[t]he Supreme Court shall have jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." On June 28, 2011, the trial court entered a final Judgment and Commitment Order affirming James' convictions. Therefore, we have jurisdiction to consider this appeal. *See Jackson-Flavius v. People*, 57 V.I. 716, 721 (V.I. 2012) ("in a criminal case, a written judgment embodying the adjudication of guilt and the sentence imposed based on that adjudication constitutes a final judgment for the purposes of 4 V.I.C. § 32(a)") (citing *Potter v. People*, 56 V.I. 779, 787 (V.I. 2012)).

## III. STANDARD OF REVIEW

The standard of review for this Court's examination of the Superior Court's application of law is plenary, while the Superior Court's findings of fact are reviewed for clear error. *Simmonds v. People*, 53 V.I. 549, 555 (V.I. 2010). We exercise plenary review over issues pertaining to the sufficiency of evidence. *See Stevens v. People*, 52 V.I. 294, 304 (V.I. 2009) and *United States v. Bornman*, 559 F.3d 150, 152, 51 V.I. 1170 (3d Cir.2009). Much deference is afforded the trial court when examining whether there is substantial evidence upon which a rational trier of fact could convict the defendant. *Bornman*, 559 F.3d at 152. The standard of review for a claim of insufficiency of evidence is whether there is substantial evidence, when viewed in the light most favorable to the government, to support the jury's verdict. *Phillip v. People*, 58 V.I. 569, 582 (V.I. 2013); *Ritter v. People*, 51 V.I. 354, 358, 361 (V.I. 2009); *see also Gov't of the V.I. v. Williams*, 739 F.2d 936, 940 (3d Cir. 1984).

## IV. ISSUES

James propounds five issues for review:

(1) Whether the trial court erred in denying James' Rule 29 Motion for Judgment of Acquittal because the evidence was insufficient to support a conviction;

(2) Whether James' Sixth Amendment right to compulsory process was violated when the trial court prohibited James from calling certain individuals to testify;

873

(3) Whether James' rights under the Equal Protection Clause of the Fourteenth Amendment were violated when the prosecutor eliminated certain cognizable groups from the jury by the exercise of the People's peremptory challenges;

(4) Whether the trial court erred by failing to grant James a new trial or declare a mistrial because of the prosecutor's statements made during closing arguments; and

(5) Whether the trial court unreasonably denied James' constitutional right to present evidence in his defense.

## V. DISCUSSION

### A. There was sufficient evidence to convict James.

James argues that the trial court erred in rejecting his Rule 29 Motion for Judgment for Acquittal. Specifically, James argues that the People only charged him as a principal under the aider and abettor statute for acting in concert with Merrifield but not as the primary actor in the murder of Edwards. (Appellant's Br. 7.) James proffers that since the phrase "aided and abetted by another" was included in the Information and recited in the trial court's final instructions to the jury, it became a requisite element of the offense charged and, therefore, needed to be proven beyond a reasonable doubt by the People.[1] (*Id.*) James asserts that the People failed to prove beyond a reasonable doubt that Merrifield aided and abetted him in the murder of Edwards and that; as a result, the element "aided and abetted by another" was not satisfied as a requisite element to finding James guilty of murder.

Title 14, section 11(a) states:

11. Principals
 (a) Whoever commits a crime or offense or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

---

[1] The trial court instructed the jury:

In order to prove the offense of murder in the first degree as charged in Count 1 of the Third amended Information against defendant James . . . the People must prove each of the following elements beyond a reasonable doubt: On or about August 22, 2009, on St. Thomas, U.S. Virgin Islands, the defendant, **aided and abetted by another**, unlawfully killed a human being, Tameka Edwards . . . (J.A. at 1278.) (emphasis added).)

James argues that the clause in the Information "aided and abetted by another" is an element of the offense and as part of the proof required during trial. Indeed, the Information charging James for the crimes surrounding the murder of Edwards was crafted in a very peculiar manner.[2] Instead of charging that James aided and abetted another in committing the crime or simply that James committed the crime, the Information charges that a second person was involved in the event and states that James was "aided and abetted *by* another."[3] (Emphasis added.)

Nevertheless, title 14, section 11 does not contemplate the acts of a second person in holding one person accountable, but rather speaks to the circumstances under which only the person charged in that count can be held responsible for the crime that was committed. Based on the language of the statute, a person is responsible for a crime, if that person "commits [the] crime . . . or aids, abets, counsels, commands, induces or procures its commission." Consequently, the People were only required to present evidence that James engaged in any of the above mentioned acts that are listed in the statute. Whether James was aided and abetted by another person has no bearing on his personal responsibility for the crimes. The clause "aided and abetted by another" is merely surplusage and not an element of first degree murder that is required to be proven at trial. The People were only required to present evidence that James committed the elements of murder and the other crimes for which he was charged.[4] Therefore, James' argument that "aided and abetted by another" is a requisite element of his first degree murder charge to be proven is meritless.

---

[2] The Information (J.A. at 89) charged in part:

On or about August 22, 2009, in St. Thomas, Virgin Islands, **NESTA JAMES**, aided and abetted by another, willfully, deliberately, and with premeditation, unlawfully killed a human being with malice aforethought, to wit: he shot and killed Tameka Edwards with a gun, in violation of 14 V.I.C. §§ 921, 922(a)(1); 14 V.I.C. § 11(a). **FIRST DEGREE MURDER**

[3] The Information of the co-defendant, Merrifield, also states "aided and abetted by another," which means that the two defendants were charged in the same exact manner. It is plausible that the People intended to charge both James and Merrifield with aiding and abetting each other in the crimes committed during the incident.

[4] The Information language encompasses all the statutory elements of 14 V.I.C. §§ 921, 922, first degree murder. It is flabbergasting as to why the People included the language of "aided and abetted by another" in the charge which is superfluous for charging James with first degree murder in this instance.

■ Here, we conclude that the evidence was sufficient to convict James of the crime for which he was charged. The evidence confirms that after being informed about Smalls' murder, Merrifield, James' co-defendant, was the first to arrive at McClean's house. (J.A. 468.) Merrifield said to McClean, "Wait till Lion gets here, wait till Lion gets here" and that when Lion got there it was "going to be on." (J.A. at 468.) Merrifield left and returned accompanied by James who was armed with a handgun. (J.A. at 468.) Both James and Merrifield started a verbal altercation in front of McClean's house by accusing McClean together with Edwards, who was not present at the verbal altercation, of setting up their very close friend, Smalls, to be murdered. James used phases such as, "where is the Crucian girl, where the Crucian girl is?" referring to Edwards who was from St. Croix. (J.A. at 469.) James also told McClean, "The best Crucian is a dead Crucian." (J.A. at 470.) Mclean testified that James said he was going to kill Edwards. At this juncture, James has a weapon and has manifested an intent to kill Edwards.

James departed the area of McClean's house several times and returned on more than one occasion with what witnesses described as a long machine gun, which was later identified as an AK-74, distinctively wrapped in a sheet or pillow case. (J.A. at 471-72.) When Edwards arrived home sometime later an AK-74 with a sheet or pillow case over it was again seen and used to threaten Lettsome, who had given Edwards a ride home. The person holding the AK-74, whose face could not be identified at the time, asked Lettsome, "[W]hat [he] doing with that girl" and told him not to move. (J.A. at 715.) The person then fired several shots at Lettsome as he hastily attempted to leave the area. Shortly after, Edwards was found dead in McClean's back yard. Although there was no testimony identifying who was holding the AK-74 when Edwards arrived home with Lettsome, James was the only person seen in the area in possession of an AK-74 with a sheet or pillow case covering it. The slug and casing found at the Estate Contant scene matched an AK-74. A firearm examiner testified that the bullets retrieved from Edwards' body were likely discharged from an AK-74 assault weapon. Also, sometime after the murder, McClean's landlord spoke with James and when the landlord asked him why he killed Edwards, James responded "Myoshi [McClean] and that girl set up my friend to — They both set up my friend." (J.A. at 842.) Accordingly, the jury could have concluded that the evidence confirmed that James not only had the motive, intent, and ability

to kill Edwards but he also believed that Edwards was complicit in the murder of his friend, Smalls.

■ Witnesses testified for both the people and the defense. Although the evidence was circumstantial, considering that there were no eyewitnesses to Edwards' murder, the jurors made a choice of whom to believe and rendered guilty verdicts. We conclude that there was sufficient evidence in the record for a reasonable jury to return guilty verdicts. Therefore, we affirm the trial court's decision to deny the defense's Rule 29 Motion for Judgment of Acquittal.

## B. James's Sixth Amendment right to compulsory process was not violated.

Next, James argues that his Sixth Amendment right to compulsory process for obtaining witnesses in his favor was violated by the trial court's refusal to require certain witnesses to testify on behalf of the defense. James states in his brief that he "sought to call as witnesses two individuals who were identified as potential suspects in the Small's homicide, so as to assist in establishing the defense that there were others on the date of Edwards' murder who had a substantial motive to kill her." (Appellant's Br. 31.) However, the witnesses that James sought to have testify on his behalf invoked their Fifth Amendment rights against self-incrimination. James argues that this mere assertion of their Fifth Amendment rights was not sufficient to preclude their testimonies at trial. James suggests that outside of the presence of the jury the trial court "should have had defense counsel state specific questions and then require a question by question invocation by the witness." (*Id.*) James also suggests that the trial court should have granted the potential defense witnesses "use or derivative use" immunity. (Appellant's Br. 32.)

■ The Sixth Amendment of the United States Constitution states that, "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor." However, the Sixth Amendment right of the accused to compulsory process to secure the attendance of witnesses does not include the right to compel a witness to waive his or her Fifth Amendment privilege against self-incrimination. *Washington v. Texas*, 388 U.S. 14, 23 n.21, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *See also United States v. Bowling*, 239 F.3d 973, 976 (8th Cir. 2001) (the "Sixth Amendment right to compulsory process . . . does

not include the right to compel a witness to waive his or her Fifth Amendment privileges against self-incrimination").

James argues that the testimony of three persons, Cuthbertson Thomas ("Thomas"), Laquan England ("England"), and Richie Fontaine ("Fontaine") was material to determining his guilt or innocence for the crimes for which he was charged. James' reasons for presenting this evidence are more thoroughly elucidated in a colloquy between his attorney and the trial court which is as follows:

> ATTORNEY TEAGUE: One of our theories in this case, Your Honor, one of our strong theories is that there were several individuals who had significant motive to see Miss Edwards dead. Miss Edwards had positively identified an individual who very likely would be facing first degree murder charges or at least second degree murder charges with respect to Mr. Smalls.
>
> . . . .
>
> When the police did the report, Your Honor, she viewed several photo albums and positively identified Mr. Laquan England as the individual that the victim in this case Jesse Smalls said that he had a beef with. Also, Mr. England and Mr. Smalls were staring at each other several times throughout the night. She also stated that she observed Mr. England taking a chrome gun out of his waist seconds before the shooting.
>
> THE COURT: Is Laquan England, is he currently being prosecuted for this?
>
> ATTORNEY GUMBS-CARTY: No, Your Honor. No one is.
>
> ATTORNEY TEAGUE: And Mr. Fontaine, we have the arrest record, he was arrested in Contant on the 23rd, the date that her body was found, at 11:15. He's one, according to Detective Marsh —
>
> THE COURT: He's arrested in connection with the Smalls matter or a separate matter?
>
> ATTORNEY TEAGUE: It's a separate matter, Your Honor, but it shows that he is in the direct vicinity, much like counsel in doing circumstantial evidence with our clients.
>
> . . . .
>
> Your Honor, their whole theory is that she was killed in revenge of this murder. Then we need to be able to show . . . the people that murdered this gentleman saw her, and saw her all that night. The gentleman that

was staring him down she was next to him the whole time. She testified to that.

THE COURT: I'm not preventing you from presenting that information, Counsel. I am preventing you however, from revealing the name of someone who is a suspect in an on-going investigation.

(J.A. at 941-54.) When defense counsel indicated that they would have these three individuals testify, the trial court inquired as to the substance of these individuals' testimonies. (J.A. at 962.) The defense responded:

ATTORNEY TEAGUE: Your Honor, I'm going to ask them if they were at Club Lexus the night of Mr. Smalls murder. I'm going to ask them if they were part of the five men group that shot and killed Mr. Smalls that night. I'm going to ask him if he saw Miss Edwards there. If he responds positively to any of those questions I am going to ask him if he had any involvement in Miss Edwards murder. I'm going to ask him where he was the day of August 22, 2009. Where he was the day of August 23, 2009. Where he resided in Contant.

(J.A. at 962-63.) The trial court judge then responded:

THE COURT: Well, I'm not going to permit them to come into the courtroom and assert their Fifth Amendment privilege in front of the jury. That would be error, Counsel.

. . . .

ATTORNEY TEAGUE: I would ask, Your Honor, that I at least be able to call th[em]. We can bring them into chambers with respect whether they're going to assert their Fifth Amendment Right with respect to questions I have proffered to the court just a few minutes ago.

THE COURT: Well, that may be appropriate, and that may be appropriate to also make sure that their counsels are present during any discussions.

(J.A. at 965-66.) Thereafter, the trial court contacted the attorneys for England, Thomas, and Fontaine, and all attorneys responded that their clients would invoke their Fifth Amendment right against self-incrimination. (J.A. at 1036-41, 1075-76.) The trial court accepted these representations from attorneys for England, Thomas, and Fontaine, on behalf of their clients. Without further discussion, the trial court rejected the defense's request to have these individuals testify. (*Id.*)

James now argues that the testimonies of these individuals were so valuable to the defense that the trial court should have conducted further inquiry as to whether, in light of their decision to invoke their Fifth Amendment rights, it was necessary for the trial court to grant immunity to each witness. We conclude that neither option that James suggests was required.

■ "To sustain the privilege [against self-incrimination], it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Bowling*, 239 F.3d at 977 (quoting *Hoffman v. United States*, 341 U.S. 479, 486-87, 71 S. Ct. 814, 95 L. Ed. 1118 (1951)). Additionally, "[t]he Fifth Amendment privilege protects a witness against 'real dangers, not remote and speculative possibilities.' " *Id.* (quoting *Zicarelli v. New Jersey State Comm'n of Investigation*, 406 U.S. 472, 478, 92 S. Ct. 1670, 32 L. Ed. 2d 234 (1972)). "When considering whether a claim of the privilege should be sustained, the court focuses inquiry on what a truthful answer might disclose, rather than on what information is expected by the questioner." *Zicarelli*, 406 U.S. at 480. As the United States Supreme Court opined in *Hoffman*: "The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself — his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified." 341 U.S. at 486 (citation omitted).

■ As confirmed by the aforementioned colloquy between the defense attorney and the trial court, in the present case, the defense wanted these three individuals or at least one of these three individuals to testify that they killed, were involved in the killing of either Smalls or Edwards, or were otherwise involved in both murders. This proposition emanates from defense counsel's proposed questions submitted to the trial court for England, Thomas, and Fontaine. Alternatively, the defense also hoped that these individuals could prove that other persons were present at the Club when Smalls died, and that these other persons saw Edwards at the murder scene with Smalls, and therefore wanted to eliminate Edwards as a potential witness in any subsequent prosecution against them. While calling these individuals as witnesses may have been valuable to the defense, it directly encompasses self-incrimination for the three potential witnesses. We have already established that the defendant's right to

compulsory process does not supersede a witness' right against self-incrimination.

Further, evidence that other persons were at the scene at the time of Small's death was admitted during the trial through other means. (J.A. at 999-1004.) The following testimony of Detective Jason Marsh regarding Edwards' statements to the police confirms this fact.

Q. Now, if you look at the third question on that page, it states: *"Did you see who was firing the shots?"* And what was the answer Miss Edwards provided?

A. *"The same one with the braids pulled out the gun. I saw him pull it out when I was going up the ramp. The male behind of him pulled one out, too, but I didn't see him."*

Q. Now, go to the next page, Detective. The first question asked — the question is *"Did you see where the males went after the shooting?"* What was the answer?

A. *"They ran towards the basketball court."*

. . . .

Q. . . . The question is: *"When did you see the males pull out guns?"* And what was the answer provided by Miss Edwards to you that morning?

A. *"As I was going up the ramp back to the club, I saw one with braids pull out the gun from his waist, and as I was passing the one behind him already had the gun in his hand."*

(J.A. at 1003-04.) This testimony placed before the jury the issue of whether Edwards was possibly seen by the gunmen the night of Smalls' murder. The jury had an opportunity to make inferences from the Edward's statement that she walked in proximity to the gunmen immediately preceding Small's murder and must have been seen by Smalls' killer or killers. Therefore, we reject James' assertion that the testimonies of England, Thomas, and Fontaine were necessary to prove that Edwards saw the individuals who may have shot Smalls, and these individuals, in turn, saw her at the murder scene, thereby giving them a motive for wanting her dead.

■■■ James also argues that the judge should have granted use or derivative use immunity to the potential witnesses. In the Virgin Islands, immunity is granted under 14 V.I.C. § 20, which allows any court in the Virgin Islands to grant immunity to a witness who refuses to testify based

on his privilege against self-incrimination. Use or derivative use immunity "prohibits the use of compelled testimony or any evidence derived from that testimony against the witness in a criminal prosecution." *United States v. Quatermain*, 613 F.2d 38, 40 (3d Cir. 1980) (citing *Kastigar v. United States*, 406 U.S. 441, 453, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972)); *see also* 14 V.I.C. §20(a)(3). We conclude, however, that the trial court was not required to grant the witnesses immunity in this case. The statutory language does not require that every witness who refuses to testify in a criminal case be granted immunity. There was no formal request before the trial by the defense or by the People for the potential witnesses to be granted immunity. James has failed to explain why immunity should have been granted to Cuthbertson, Thomas, and Fontaine which would have benefited all or any of them. Therefore, we reject James' assertion that his Sixth Amendment right to compulsory process was violated.

## C. James' was not deprived of any right to present relevant evidence.

James argues that he should have been allowed to reveal the identities of England, Thomas, and Fontaine and that prohibiting him from doing so was error. This argument is similar to his Sixth Amendment compulsory process argument. Specifically, James argues that his right to present relevant evidence was violated by not being allowed to reveal the identity of the individual Edwards "identifies to police as one of the men she saw with a handgun seconds before Smalls was killed, and the identity of two additional individuals — both known associates of the person identified by Edwards — whom the police had information were likely present at the club the morning of the shooting." (Appellant's Br. 19.) James argues that the evidence of the identities of these individuals was necessary because one of these persons was arrested on a separate matter in Estate Contant, a short distance from the murder scene, on August 23, 2009, the very day Edwards' body was discovered — thus placing him in the immediate vicinity, close in time to her death. (J.A. at 949-50.)

■ "The right to present relevant evidence is 'subject to reasonable restrictions.'" *Malone v. People*, 53 V.I. 408, 420 (V.I. 2010) (citing *United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998)). Excluded evidence will only be unconstitutionally arbitrary or disproportionate warranting reversal if it "infringed upon a

weighty interest of the accused." *Id.* (quoting *Scheffer*, 523 U.S. at 308). James explained that his theory of the case is that "there were other individuals who had the means, motive, and opportunity to commit the crime besides [James]", and to say there were other individuals without going into their background, their tendency for violence, perhaps reputation in the community" is not good enough. (J.A. at 991.)

As discussed above, through the testimony of Detective Marsh, James was able to present evidence regarding the presence of other individuals at the Smalls murder scene who may have been interested in harming Edwards. The inclusion of Marsh's testimony covered the necessary elements that could have been presented by the trial court allowing James to state the names of the individuals. James has failed to produce any relevant evidence, direct or circumstantial, linking these three, or any of the three, individuals to Edwards' murder. Accordingly, there was no infringement by the trial court on James' ability to present relevant testimony.

## D. The trial court did not err in refusing to grant a new trial because of alleged prosecutorial misconduct.

 James argues that the prosecutor's conduct at various times during trial was improper and affected his right to a fair trial thereby meriting a reversal of the convictions. (Appellant's Br. 25.) "The test for prosecutorial misconduct is whether the conduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process' in light of the entire proceeding." *United States v. Morena*, 547 F.3d 191, 194 (3d Cir. 2008) (citing *Marshall v. Hendricks*, 307 F.3d 36, 64 (3d Cir. 2002)). Reversal may be warranted based on prosecutorial misconduct to which there was a proper objection, if the defendant shows that: (1) the prosecutor's conduct or remarks were improper, and (2) the conduct or remarks affected the trial in a manner that made the trial unfair and affected the defendant's substantial rights. *Farrington v. People*, 55 V.I. 644, 656 (V.I. 2011) (citing (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974))). "[W]e examine the curative instructions, if any, given by the trial court; the weight of the properly admitted evidence against the defendant; and the prosecutor's improper actions." *United States v. Liburd*, 607 F.3d 339, 344, 53 V.I. 890 (3d Cir. 2010) (citing *Morena*, 547 F.3d at 194). James asserts that these

errors were so detrimental to his rights as to result in a mistrial which compels a remand to the trial court.

### A. First instance of alleged misconduct

James proffers that on redirect examination, "the Government then asked Brown why he was unemployed, to which he responded that several months after Edwards' murder, he had heard Appellant was going to kill McClean." (Appellant's Br. 26.)[5] James argues that the testimony was irrelevant and that there is no procedure for erasing the prejudicial statement from the jurors' minds. James further argues that although the trial court gave a curative instruction on this issue, the prejudice was so severe that no instructions by the judge could cure its adverse effect. James is correct in noting that the testimony was irrelevant. Under Rule 401 of the Federal Rules of Evidence, relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The reasons for Brown's employment or unemployment were of no consequence to the murder of Edwards. Consequently, the trial court correctly ruled the testimony inadmissible.

 The following excerpt of the testimony and the curative instruction from the trial court is instructive:

> Q. Why are you unemployed now, Mr. Brown?
>
> A. Okay, like couple months after the incident, right, we start to hear like threats out there saying that, oh, that Lion say he going to kill Myoshi —
>
> ATTORNEY SCALES: Objection.
>
> A. You ask me, I going to explain.
>
> THE COURT: You will disregard that comment. It played no role in your consideration of the evidence in this case. Mr. James is not charged with making any threats to this witness, and you may not consider that comment in any respect with regard to this case.

---

[5] The defense argues that this would illustrate to the jury that the witness and McClean were in the witness protection program and thus show the propensity for violence and other ill characteristics of James.

(J.A. at 579-80.) James cites to the Third Circuit Court of Appeals case of *United States v. Carney*, 461 F.2d 465 (3d Cir. 1972), to support his proposition that the testimony was too prejudicial to be cured. However, *Carney* is distinguishable from this case. In *Carney*, the witness, a co-conspirator of the defendant, testified that the defendant had previously committed another crime when he tried to kill the witness and the witness' two children. *Id.* at 466. The court noted that the testimony given by the witness was irrelevant and further noted that it was prejudicial because it could only be interpreted as a factual statement by the witness that the defendant committed prior serious crimes. *Id.* at 467. The Third Circuit cited one of its precedential cases in explaining why the testimony was prejudicial: "in *Government of Virgin Islands v. Oliver*, 360 F.2d 297, 5 V.I. 568 (3rd Cir. 1966), [we] held [that] it is settled that 'evidence of other offenses is inadmissible in a criminal prosecution for a particular crime when such evidence is designed to show a mere propensity or disposition on the part of the defendant to commit the crime.' " *Id.* at 299 (quoting *United States v. Stirone*, 262 F.2d 571, 576 (3rd Cir. 1959)) (internal quotation marks and original alterations omitted). A prompt curative instruction has been found effective in many instances in which inadmissible evidence is offered. *United States v. Cortez*, 252 Fed. Appx. 887, 892-93 (10th Cir. 2007); *United States v. Talley*, 194 F.3d 758, 764 (6th Cir. 1999).

Here, no testimony was elicited concerning James committing a prior crime. This witness offered a hearsay statement of what he heard to be James' intent to kill McClean, in response to why he was no longer employed. Based on the testimony offered it is obvious that the witness was unsure as to the truth of the statement. Therefore, it is not inevitable that the jury interpreted the testimony as a factual statement, as was the conclusion made in *Carney*.

 Accordingly, the trial court's rejection of the statement and subsequent curative instruction were sufficient to cure the inadmissible statement of the witness. Furthermore, even without the statement there was sufficient evidence to convict James as explained in Part V. A. of this Opinion. Although the prosecutor erred in eliciting that statement from the witness, it was not so prejudicial as to affect James' substantial rights or be determinative of the jury's verdict.

### B. Prosecutor's closing arguments where objections were made

James argues that the prosecutor perpetrated fraud upon the jury by telling the jury, over his objections, that there was no connection between

Edwards and Fontaine, whose name had been mentioned during the trial. (Appellant's Br. 28.) The prosecutor, during closing arguments, stated:

> ATTORNEY GUMBS CARTY: . . . Richie Fontaine arrested August 23rd. Many people are arrested at any time on the island anywhere. So, does that add up? There is no link whatsoever in this case. And you heard the detective testify, there is no link whatsoever between Fontaine and Tameka Edwards.
>
> ATTORNEY TEAGUE: Objection, Your Honor.

(J.A. at 1198.) Additionally, the trial court provided the following curative instructions in the final jury instructions:

> THE COURT: . . . Certain things are not evidence, I will list them for you again. The arguments and the statements by the lawyers are not evidence. The lawyers are not witnesses, and what they say during their opening statements, closing arguments and at other times is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of the facts controls.

(J.A. at 1265.) James argues that this statement is not true and the prosecutor knew it not to be true. James further argues that the statement was intended to "discredit in the jurors' minds as to why this individual's name was called repeatedly over and over during trial." (Appellant's Br. 29.)

James also finds error when the prosecutor said:

> ATTORNEY GUMBS CARTY: . . . Now, you also heard Mr. Brown and Miss McClean said they slept out that night, they slept out that night, they slept down by his job. They were frightened, clearly. Imagine something like 6 o'clock in the morning and the whole of Contant, or ten people or whatever number of people are outside your apartment to the point where she had to go inside and get a big stick to defend herself. But just imagine the trauma she went through also, the fear, the fear that Mr. Brown —
>
> ATTORNEY DIRUZZO: Objection, Your Honor, golden rule.
>
> THE COURT: Overruled.

(J.A. 1207.) In this second instance, James asserts that this comment which implores the jury to place themselves in the victim's shoes is improper.

James also contends that the prosecutor was inappropriately pandering the jury by mentioning how Edwards will never be able to reach her goals of becoming a veterinarian, as well as her other plans. (Appellant's Br. 29.) James refers to:

ATTORNEY GUMBS CARTY: Tameka Edwards was 19 years of age. A teenager. A kid. Her step dad testified that she wanted to become a veterinarian.

ATTORNEY DIRUZZO: Objection, Your Honor.

THE COURT: The nature of your objection, Counsel?

ATTORNEY DIRUZZO: Asking for the jury's sympathy to the victim.

THE COURT: Overruled.

ATTORNEY GUMBS CARTY: Her step dad testified that she wanted to become a veterinarian, that she loved animals. She was in good health before she was killed. She like to have fun. A young person. A person with goals, dreams have been cut short. She was not married, she didn't have any children. Mr. Kean, and of course her mother, will not have the love, never have the love of Tameka Edwards. They will never see marry, no children —

ATTORNEY DIRUZZO: Objection.

THE COURT: The objection is sustained at this point, counsel. Move to your next area.

However, during the final jury instructions, the judge stated:

THE COURT: . . . And you must decide this case solely on the evidence and the law. You will recall that you took an oath promising to do just that at the beginning of the case.

. . . .

It would be a violation of your sworn duty to base a verdict upon anything other than the evidence and the instructions of the Court.

(J.A. at 1262-64.) Considering these instructions, even if the comment was improper, it was harmless error.

██ ██ It is noteworthy that these comments were made during closing arguments. "A prosecutor is permitted vigorous advocacy, so long

as he does not stray into forbidden terrain." *United States v. Taylor*, 54 F.3d 967, 976 (1st Cir. 1995). "It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935). Counsel is afforded the opportunity to present arguments before the jury with much force and vigor. *United States v. Wilner*, 523 F.2d 68, 74 (2d Cir. 1975). "The prosecutor [is] entitled to marshal all the inferences which the evidence support[s]." *Id.* (citing *United States v. White*, 486 F.2d 204 (2d Cir. 1973)). "[T]he cardinal rule of closing argument [is] that counsel must confine comments to evidence in the record and to reasonable inferences from that evidence." *United States v. Lopez-Medina*, 596 F.3d 716, 740 (10th Cir. 2010) (alterations in original). The purpose of closing argument is to mold the facts given during trial in the light most favorable to one's client. In the instances cited by James, there is no misconduct on the part of the prosecutor. She was well within the bounds of appropriate behavior by reiterating the facts in a manner that favored the People. The detective's testimony that there was no link between Fontaine and Edwards gave the prosecutor leeway to include that evidence in her closing arguments. She left it up to the jury to determine the facts for themselves.

The judge was able to sufficiently cure the potential errors of the prosecutor. The trial court provided sufficient final instructions to cure any harm that may have resulted from the prosecutor's zealous representation of the facts. Reviewing the entire trial record, neither of the prosecutor's two statements justifies rejecting the jury's verdicts.

### C. Prosecutor's closing arguments where no objection was made.

James argues that there was misconduct when the prosecutor presented the following factual scenario:

> So, on the 23rd — what it means is that Tameka Edwards' body was on the ground, lying there. Mr. James walked back, possibly stepped over her body to plug in his cell phone, stepped back over her body and left his phone there to charge. What does that tell you?

(J.A. at 1208.) James argues that "by improperly painting a picture of Appellant physically stepping over the body of the victim, not once, but twice,

for such a mundane purpose as to charge his cellular phone, the emotional impact was evident." (Appellant's Br. 29). James failed to object to this statement during trial; therefore, we review for plain error. (J.A. at 1208.) To find plain error, this Court must find (1) an error, (2) that is plain, and (3) that it affected substantial rights. If we determine that the error meets those requirements, we may grant relief in our discretion if (4) we find the error seriously affects the " 'fairness, integrity, or public reputation of the judicial proceedings.' " *Jackson-Flavius*, 57 V.I. at 721 (quoting *United States v. Dobson*, 419 F.3d 231, 236 (3d Cir. 2005)). The same standards discussed immediately above apply regarding the ability for a prosecutor to zealously represent the People.

▮ There is testimony in the record that on the day McClean saw Edwards' dead body, she found what she identified to be James' cell phone charger on her porch plugged into the electrical outlet. (J.A. at 486-90.) There is also evidence that Edward's body was found in McClean's yard. (J.A. at 490.) There was no evidence of anyone stepping over the dead body. There was no testimony of when the charger was plugged into the electrical outlet as compared to the length of time Edwards' body was lying on the ground. There was no evidence of the location of the phone relative to the location of Edwards' body. Therefore, the prosecutor's statement during closing arguments that "Mr. James walked back, possibly stepped over her body to plug in his cell phone, stepped back over her body and left his phone there to charge," were not based on any evidence or reasonable inference. Rather, the statement was made in an effort to arouse the emotion of the jury. Statements that tend to incite or inflame the jury constitute prosecutorial misconduct. *United States v. Johnson*, 231 F.3d 43, 47, 343 U.S. App. D.C. 409 (D.C. Cir. 2000).

▮ There was no curative instruction given in this situation. We conclude that allowing this highly prejudicial statement to go before the jury constituted error. However, we further conclude that the error did not seriously affect the "fairness, integrity, or public reputation of the judicial proceedings" and likewise, it did not affect James' substantial rights when compared to all the evidence presented in this case. Moreover, it is noteworthy, as directed in *Morena*, that we are to consider all the evidence against the defendant that was presented at trial. 547 F.3d at 196-97. Earlier we stated that there was sufficient evidence to convict James.

889

Considering that conclusion and this error, the error does not constitute a reason to reverse the jury's decision.

## B. James' rights under the Equal Protection Clause were not violated during jury selection.

██ James argues that his right to equal protection was violated during jury selection because several jurors were stricken for race and ethnicity reasons. In the case of *Batson v. Kentucky*, 476 U.S. 79, 85, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the Supreme Court held "that [a] [s]tate denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposely excluded." The Supreme Court in *Batson* established a three step process in determining whether there has been an equal protection violation. First, a defendant must make out a prima facie case of discriminatory jury selection by "the totality of the relevant facts" about a prosecutor's conduct during the defendant's own trial. *Id.* at 93-94. Once that showing is made, the burden shifts to the People to come forward with a race-neutral explanation. *Id.* at 97. Thereafter, the trial court must determine if the defendant has shown "purposeful discrimination," in light of "all relevant circumstances." *Id.* at 98, 96.

During jury selection, the People exercised its peremptory challenges and struck jurors numbers 5 and 9. The People also struck jurors 14 and 24 for which the defense again objected on the basis that they are black males. (J.A. at 367-368.) To reiterate, this fact is insufficient to warrant a reversal of the verdicts considering that all except for two jurors were black. However, even in this case the prosecutor provided sufficient race neutral reasons for the strikes. Specifically, the People argued lack of interest by juror 14. Regarding juror 24, the People originally stated that because of the young age of the juror, he would not understand the seriousness, nature and intricacies of the case. The trial court rejected that reasoning and the People also stated that their office was intimately familiar with the potential juror's family as defendants. (J.A. 370.) The defense attorney also challenged the striking of juror 20 based on race. The People argued that they struck that juror because she was a victim of a violent crime and might have animosity against the government. (J.A. at 373.) The defense raised *Batson* challenges to these strikes arguing that the defendants were black males and the persons stricken from the jury were black females. (J.A. at 358.) However, the defense failed to make a

prima facie showing of discriminatory jury selection. It was not sufficient to suggest that discrimination occurred merely because the defendants were black and the stricken jurors were also black. At venire, all of the potential jurors were black with the exception of approximately two persons. With that ratio, it was inevitable that a black juror would have been stricken from the jury pool. It is also noteworthy that the majority of the Virgin Islands population is black and likewise, during jury selection the majority of the members will, as a result, be black. Absent more evidence, it is preposterous to claim that the striking of the jurors was racially motivated under these circumstances.

Furthermore, the prosecutor gave adequate race-neutral reasons for its strikes. The prosecutor justified the strikes by stating that juror 5 was very young and not experienced enough to render a decision and juror 9 was unemployed with a number of children to support and would be focused on the financial hardship caused by jury service, rather than the case at hand. The trial court allowed the strikes. (J.A. at 365.)

 James also argued that the two jurors there were struck were from an island other than St. Thomas and alleged that they were struck for ethnicity reasons. (J.A. at 358.) The jury pool is not only comprised of persons born in the Virgin Islands but also persons born on surrounding Caribbean islands that are permanent Virgin Islands residents and naturalized United States citizens. Likewise, the jury pool consists of people of many ethnicities that were born on the continental United States. James has failed to establish that that there is an ethnic basis for the strikes merely because the jurors that were struck were from an island other than St. Thomas. We conclude that under these circumstances there was no Fourteenth Amendment violation.

## VI. CONCLUSION

For the above stated reasons, we affirm James' conviction and the June 28, 2011 Judgment and Commitment.