IN THE SUPREME COURT
OF THE VIRGIN ISLANDS

**FILED**
January 03, 2024 09:36 AM
SCT-Civ-2022-0049
VERONICA HANDY, ESQUIRE
CLERK OF THE COURT

**For Publication**

# IN THE SUPREME COURT OF THE VIRGIN ISLANDS

| | |
|---|---|
| **WARREN MOSLER, CHRIS HANLEY, and CHRISMOS CANE BAY, LLC,**<br>Appellants/Defendants | ) **S. Ct. Civ. No. 2022-0049**<br>) Re: Super. Ct. Cs. No. 368/2005<br>)<br>) |
| v. | )<br>) |
| **JOSEPH GERACE and VICTORIA VOOYS D/B/A CANE BAY BEACH BAR,**<br>Appellees/Plaintiffs | )<br>)<br>) |

On Appeal from the Superior Court of the Virgin Islands
Division of St. Croix
Superior Court Judge: Hon. Harold W.L. Willocks

Argued: March 8, 2023
Filed: January 3, 2024

Cite as 2024 VI 1

**BEFORE:** **RHYS S. HODGE**, Chief Justice; **MARIA M. CABRET**, Associate Justice, and **IVE ARLINGTON SWAN**, Associate Justice.

**APPEARANCES:**

**Joel H. Holt, Esq.**
Law Offices of Joel Holt
St. Croix, U.S.V.I.
  *Attorney for Appellants,*

**Rhea R. Lawrence, Esq. (argued)**
**Lee J. Rohn, Esq.**
Law Offices of Lee J. Rohn and Associates, LLC
St. Croix, U.S.V.I.
  *Attorneys for Appellees.*

## OPINION OF THE COURT

**HODGE, Chief Justice.**

¶ 1    Warren Mosler, Chris Hanley, and Chrismos Cane Bay, LLC (collectively "Defendants")

*Mosler et al. v. Gerace et al.*　　　　　　　　　2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 2 of 37

appeal the Superior Court's September 13, 2022 opinion and order, which granted in part and denied in part their motion for judgment as a matter of law and denied their motion for a new trial. Joseph Gerace and Victoria Vooys (collectively "Plaintiffs") filed a cross-appeal, arguing that the Superior Court erred in vacating the jury's award for breach of contract, breach of good faith and fair dealing, defamation and punitive damages. For the reasons that follow, we affirm in part and reverse in part the judgment below.

## I.　　BACKGROUND

¶ 2　　Plaintiffs met in culinary school and upon graduation looked into buying a restaurant together. They found a posting online for Cane Bay Beach Bar and Restaurant ("CBBBR") in St. Croix, U.S.V.I. They decided to buy CBBBR and move to St. Croix in August 2003. Shortly before arriving in St. Croix, the previous owner of CBBBR told the Plaintiffs that CBBBR did not have a lease for the restaurant premises. Despite not having a lease, Plaintiffs decided to continue with the move because they had already sold their property in Arizona and had packed up all their belongings. Once they arrived in St. Croix, Plaintiffs discovered that the landlord was selling the property where CBBBR is located.

¶ 3　　The new landlord and owner of the property was Chrismos Cane Bay, LLC ("Chrismos"), a limited liability company formed by Hanley and Mosler. Plaintiffs met Hanley and Mosler a few weeks after Plaintiffs started operating the restaurant. During this first meeting, Plaintiffs requested that Defendants provide them with a seven-year lease. Defendants believed the request was reasonable, but articulated some conditions before Plaintiffs would get a lease. Defendants wanted Plaintiffs to replace screens and sinks, to paint the outside of the restaurant, to resurface the bar and do a general cleanup.

*Mosler et al. v. Gerace et al.*                    2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 3 of 37

¶ 4     In March 2004, Defendants presented Plaintiffs with a two-and-a-half-year lease. Plaintiffs believed this lease to be terrible. The lease did not give Plaintiffs an option to extend, raised the rent from $1,500 to $2,000 and was not assignable to any other person. Under its terms, Plaintiffs would also have to give up their right to a jury trial if there was a conflict and had to perform all repairs on the building. Vooys testified that she shared their concerns with Hanley and he agreed that the lease was not good and he would work on a new lease.

¶ 5     In August 2004, CBBBR suffered a fire in the kitchen and the restaurant part of CBBBR had to close, although the bar area still could be used. The cause of the fire was a ventilation hood over the kitchen stove that was too small. Before Plaintiffs invested more money in the restaurant, they again asked Defendants whether they would get a seven-year lease. Defendants told Plaintiffs if they fixed the damages caused by the fire that Defendants would discuss giving them a longer lease. Defendants also told Plaintiffs that they should focus on the repairs and not worry if rent was late. Plaintiffs therefore bought a new hood for the stove, which was the proper size, and re-painted the restaurant.

¶ 6     In November 2004, Defendants offered Plaintiffs another lease. This lease kept the rent at $1,500 per month at first but then increased the rent to $2,500 per month after six months. Per Gerace's request, the tenant's name was Barabus, Inc., a corporation that Plaintiffs formed. However, like the March 2004 lease, this November 2004 lease was not for seven years, but for two years. Plaintiffs gave this proposed lease to the attorney they had used to form Barabus. The lawyer, however, did not reach out to Defendants and Plaintiffs did not follow up with their attorney about the lease.

¶ 7     In March 2005, Mosler began to accuse Plaintiffs of being late with their rent and informed Plaintiffs that he did not like the direction the restaurant was going, that "[h]e had issues with the

*Mosler et al. v. Gerace et al.*          2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 4 of 37

full moon parties and the crowds and element that the parties brought," and that "[h]e wanted to turn it in[to] a white, middle-class restaurant." Mosler also met with Plaintiffs and told them that he had a buyer in place for the restaurant, Jim Jordan, and he wanted Jordan to take over. About a week later, Defendants and Plaintiffs sat down for a meeting at CBBBR. At the meeting, Mosler told Plaintiffs that they were not getting a lease and reiterated that he wanted a white, middle-class restaurant. According to Vooys, Mosler specifically stated that "[h]e thought [the restaurant] was dirty" and that "he didn't like . . . the clientele we were bringing in and he wanted to be able to bring his clients to have meetings, more like a white, middle[-]class restaurant, and we needed to come up with an exit strategy." When the meeting ended, Plaintiffs were upset; Vooys left the table crying. A few days later, Hanley returned to CBBBR and offered Plaintiffs the seven-year lease they had requested, but only so they could sell the restaurant to Jordan.

¶ 8      On April 12, 2005, Chrismos served a letter on Plaintiffs stating that it was Defendants' understanding that Plaintiffs were vacating the premises by the end of the month. The letter also stated that any personal property that remained at that time would be deemed abandoned. Plaintiffs hired a new attorney, who sent a letter on Plaintiffs' behalf stating that they had no intention of leaving the premises.

¶ 9      After receiving the April 12, 2005 letter, Mosler went on a broadcast radio talk show hosted by Roger Morgan and began what Plaintiffs describe as a smear campaign. Mosler stated that Plaintiffs were always late with rent, and that they did not know how to run a restaurant, and otherwise talking negatively about Plaintiffs. As a result of Mosler going on the radio, Vooys claims that the restaurant started to decline, and that people were not coming. Plaintiffs ended up selling the restaurant to Jordan on June 17, 2005, for $30,000. Jordan had initially offered $50,000.

*Mosler et al. v. Gerace et al.*                    2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 5 of 37

¶ 10    Plaintiffs filed a lawsuit on June 8, 2005, against the Defendants, suing them for defamation, libel, slander, and defamation *per se*, fraud, misrepresentation, intentional or negligent infliction of emotional distress, and breach of the duty of good faith and fair dealing. Plaintiffs also sued Chrismos only for breach of contract.[1] Plaintiffs also pled for recovery of punitive damages and requested an award of pre- and post-judgment interest.

¶ 11    After more than 15 years of legal proceedings, including an earlier appeal to this Court, *see Gerace v. Bentley*, 65 V.I. 289 (V.I. 2016), a trial on Plaintiffs' claims began on February 23, 2022.  Plaintiffs' main witness was Victoria Vooys.  Defendants moved for judgment as a matter of law after Plaintiffs rested their case, which the Superior Court partially granted, partially denied, and partially took under advisement.  The Superior Court granted the motion with respect to the claim for intentional or negligent infliction of emotional distress but denied it as to the breach of contract claim.  Although Defendants also sought judgment as a matter of law as to the remaining claims, the Superior Court took that portion of the motion under advisement.

¶ 12    On March 1, 2022, after Defendants rested their case, Defendants again moved for judgment as a matter of law on all remaining counts. The Superior Court again took the matter under advisement.  On March 4, 2022, the jury returned a verdict finding that Chrismos had an agreement with Plaintiffs and breached that agreement by not giving them a lease, that Defendants intentionally misrepresented to Plaintiffs that they would get a seven-year lease, and that Defendants also breached their duty of good faith and fair dealing.  The jury awarded $100,000 in damages to the Plaintiffs. The jury also found that Mosler and Hanley had defamed Plaintiffs

---

[1] Plaintiffs initially also sued three other defendants, but the counts against them were dismissed and have no bearing on this appeal.

*Mosler et al. v. Gerace et al.*                    2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 6 of 37

and awarded Gerace and Vooys $60,000 each on those claims. Finally, the jury found that the actions of Mosler and Hanley warranted punitive damages and awarded Vooys $100,000 on that claim.[2]

¶ 13    On March 22, 2022, Defendants renewed their motion for judgment as a matter of law, and on March 24, 2022, Plaintiffs moved the Superior Court to enter judgment. On June 9, 2022, Plaintiffs renewed their motion to enter judgment. (J.A. 461.)  The Superior Court denied Plaintiffs' motion on July 9, 2022.

¶ 14    Ultimately, the Superior Court issued an opinion and order on September 13, 2022, that granted in part Defendants' motion for judgment as a matter of law, but denied their motion for a new trial.  In its opinion, the Superior Court upheld the jury's verdict on the intentional misrepresentation claim, but set aside its verdict on the claims for breach of contract, breach of the duty of good faith and fair dealing, and defamation, and also vacated the punitive damage award. The Superior Court then entered judgment later that same day.

¶ 15    Defendants timely filed their notice of appeal with this Court on September 27, 2022.  *See* V.I. R. APP. P. 5(a)(1).  On October 7, 2022, Plaintiffs timely filed their notice of cross-appeal. *Id.*

## II.    DISCUSSION

### A.  Jurisdiction and Standard of Review

¶ 16    The Supreme Court [has] jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court." 4 V.I.C. § 32(a); *see also* 48 U.S.C. § 1613a(d).

---

[2] Due to an apparent mistake in the verdict form, there was no opportunity for the jury to determine punitive damages for Gerace because this question was omitted from the form. Plaintiffs have not raised this issue as part of their cross-appeal.

*Mosler et al. v. Gerace et al.*          2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 7 of 37

The Superior Court's September 13, 2022 opinion and order disposed of all issues and claims between the parties and is a final order within the meaning of section 32. As such, this Court possesses jurisdiction over this appeal.

¶ 17    We exercise plenary review over applications of law and reviews finding of fact for clear error.    *See St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 329 (V.I. 2007). Additionally, this Court

> exercises plenary review of an order granting or denying a motion for judgment as a matter of law. When reviewing such motions, we apply the same standard as the Superior Court.  Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability. A motion for judgment as a matter of law should be granted only when viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability. In performing this narrow inquiry, trial courts and appellate courts must refrain from weighing the evidence, determining the credibility of witnesses, or substituting their own version of the facts for that of the jury.

*Charles v. Payne*, 71 V.I. 638, 643 (V.I. 2019) (alterations omitted).

## B.  Motion for Judgment as a Matter of Law

¶ 18    Both Plaintiffs and Defendants raise issues with respect to the Superior Court's disposition of Defendants' motion for judgment as a matter of law.  "This Court reviews the sufficiency of the evidence to support a damages award pursuant to the same standard under which it reviews a motion for a directed verdict—that is, we must consider the evidence in the light most favorable to [the plaintiffs], including giving [the plaintiffs] the benefit of all reasonable inferences to be drawn from that proof." *Atl. Human Res. Advisors, LLC v. Espersen*, 76 V.I. 583, 630 (V.I. 2022) (citing *Chestnut v. Goodman*, 59 V.I. 467, 475 (V.I. 2013)).  Under this highly deferential standard, this Court is prohibited from independently weighing the evidence or determining the credibility of witnesses.  *See Fontaine v. People*, 56 V.I. 571, 585-86 (V.I. 2012). Importantly, it

*Mosler et al. v. Gerace et al.*          2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 8 of 37

is the quality of the evidence that controls, and not the number of witnesses or the type of evidence used. *LIAT (1974), Ltd. v. Cherubin*, 2022 VI 21, ¶25. Applying this standard, we discuss each claim in turn.

1. Breach of Contract

¶ 19    To succeed in a breach of contract case, "a plaintiff must allege: (1) an agreement, (2) a duty created by that agreement, (3) a breach of that duty, and (4) damages." *Pollara v. Chateau St. Croix, LLC*, 58 V.I. 455, 473 (V.I. 2013) (quoting *Arlington Funding Servs., Inc. v. Geigel*, 51 V.I. 118, 135 (V.I. 2009)). Here, the Superior Court set aside the jury's verdict in favor of Plaintiffs on the contract claim because it concluded, as a matter of law, that there had been no enforceable agreement between the parties. Specifically, the Superior Court determined that, for an agreement to lease premises to be enforceable, it needs to have material information that is certain, such as the length of the lease, the names of the parties, and the rent amount.

¶ 20    The issue of what constitutes an enforceable agreement in the Virgin Islands is certainly a question of common law. This Court, however, has never resolved that question, let alone adopted the elements that the Superior Court applied in its September 13, 2022 opinion. As a result, the Superior Court possessed an obligation to conduct a *Banks* analysis regarding the best rule for application in the Virgin Islands—and its failure to do so constitutes reversible error. *See Banks v. International Rental & Leasing Corp.*, 55 V.I. 967 (V.I. 2011); *Toussaint v. Stewart*, 67 V.I. 931, 951-52 (V.I. 2017). Nevertheless, given that the underlying lawsuit has been pending for nearly 20 years, in the interest of judicial economy we exercise our discretion to conduct the *Banks* analysis in the first instance, rather than electing to remand the matter to the Superior Court. *Inniss v. Inniss*, 65 V.I. 270, 280 n.7 (V.I. 2016).

¶ 21    In conducting a *Banks* analysis, a court must "consider three non-dispositive factors: (1)

*Mosler et al. v. Gerace et al.* 2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 9 of 37

whether any Virgin Islands courts have previously adopted a particular rule; (2) the position taken by a majority of courts from other jurisdictions and (3) most importantly, which approach represents the soundest rule for the Virgin Islands." *Simon v. Joseph*, 59 V.I. 611, 623 (V.I. 2013) (citing *Matthew v. Herman*, 56 V.I. 674, 680-81 (V.I. 2012)). As we recently explained,

> While none of these three factors is individually dispositive, each plays an important role in the analysis. The first factor—whether other Virgin Islands courts previously adopted a particular rule—in effect requires a court to consider stare decisis; that is, whether the legal community and the public have reason to rely on a particular common law rule despite it not having yet been adopted by this Court. The second factor—the positions taken by other jurisdictions—informs the court of the existence of the majority and minority rules as well as the reasoning other jurisdictions relied upon to support them, thus ensuring that the court is not only aware of the potential possibilities but that it also may benefit from any national debate and how those rules may have operated in practice elsewhere. And the third and most important factor—determining the soundest rule for the Virgin Islands—requires a court to consider the practical implications of adopting a particular rule in the Virgin Islands as well as what rule is best in accord with the public policy of the Virgin Islands, including its consistency with related statutes, court rules, and judicial precedents. Notably, the ultimate goal of a *Banks* analysis is to ensure the creation of indigenous Virgin Islands law free of undue outside influence—as intended by Congress and the Virgin Islands Legislature in creating a local judiciary independent of the federal judiciary.

*Robertson v. Banco Popular de P.R.*, 2023 VI 3, ¶ 28 (internal citations and quotation marks omitted).

¶ 22     A look at our case law reveals that no Virgin Islands court has definitively established the standards for an enforceable agreement. In *Phillip v. Marsh-Monsanto*, 66 V.I. 612 (V.I. 2017), this Court determined the elements of a breach of contract cause of action, one of which is that there needs to be an agreement. In determining the elements for a breach of contract claim, we also cited *Brouillard v. DLJ Mort. Capital Inc.*, 63 V.I. 788, 798 (V.I. 2015), which listed the first element for a breach of contract claim as there needing to be "a contract" which is different from the language used in *Marsh-Monsanto* of the first element being "an agreement." However, we

*Mosler et al. v. Gerace et al.*                    2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 10 of 37

cannot say that this fleeting reference, unaccompanied by any substantive analysis, constitutes a definitive determination by this Court that these terms may be used interchangeably. *See In re Moorhead*, 2022 VI 20, ¶ 17 n.1 ("[U]nstated assumptions on non-litigated issues are not precedential holdings binding future decisions.") (quoting *Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285, 1288 (9th Cir. 1985)),

¶ 23    A review of the jurisprudence from other jurisdictions reflects that seemingly all jurisdictions have determined that an agreement "is a manifestation of mutual assent on the part of two or more persons," and thus broader than a contract. *Int'l Bus. Machs. Corp. v. Khoury*, 177 A.3d 724, 731 (N.H. 2017) (citing RESTATEMENT (SECOND) OF CONTRACTS §3 (1981)); *see also Ames v. Ames*, 370 P.3d 246, 249 (Ariz. Ct. App. 2016) ("An agreement is formed only when a manifestation of mutual assent occurs."); *Reigelsperger v. Siller,* 150 P.3d 764, 767 (Cal. 2007); *Denver Truck Exch. v. Perryman*, 307 P.2d 586 (Colo. 1957); *Roberts v. Veterans Co-op. Housing Ass'n*, 88 A.2d 324 (D.C. 1952); *Bd. of Educ. of Arbor Park Sch. Dist. No. 145, Cook Cty. v. Ballweber*, 451 N.E.2d 858, 861 (Ill. 1983); *Goldstein v. Miles*, 859 A.2d 313, 327 (Md. Ct. Spec. App. 2004); *Youngs v. Conley*, 505 S.W.3d 305 (Mo. Ct. App. 2016) (discussing that an agreement is reached when the minds of the contracting parties meet and assent to the same thing); *Carter v. Prairie Oil & Gas Co.*, 160 P. 319 (Okla. 1916); *Helpin v. Trs. of Univ. of Pa.*, 969 A.2d 601, 611 (Pa. Super. Ct. 2009); *Gaskins v. Blue Cross-Blue Shield of S.C.*, 245 S.E.2d 598 (S.C. 1978); *Vander Heide v. Boke Ranch, Inc.*, 736 N.W.2d 824, 8323 (S.D. 2006); *Martin v. Martin*, 326 S.W.3d 741 (Tex. App. 2010); *Corbit v. J.I. Case Co.*, 424 P.2d 290, 296-97 (Wash. 1967);

*Mosler et al. v. Gerace et al.*                    2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 11 of 37

*Farmer's Auto. Ins. Ass'n v. Union Pac. R. Co*, 756 N.W.2d 461, 467 (Wis. Ct. App. 2008).[3]

¶ 24     Finally, we conclude that recognizing a distinction between an "agreement" and a "contract" constitutes the soundest rule for the Virgin Islands.  As the analyses conducted by the above-cited courts reflects, these words possess different meanings both in common usage in the English language as well as in the law, and we can discern no legitimate reason to disregard those well-established meanings.  Thus, we conclude that the terms "agreement" and "contract" are not synonyms, in that an agreement is a broader term than a contract.  An agreement is "a coming together of parties in an opinion or determination, the union of two or more minds in a thing done or to be done." *See Gaskins*, 245 S.E.2d at 600.  In contrast, a contract requires more than simply agreeing to do something: "a contract is created only when parties mutually assent to specific terms" in which there is "an offer and an acceptance" in which "the offer and acceptance must mirror each other in order for a contract to be legally formed." *Toussaint*, 67 V.I. at 951-52 (citing RESTATEMENT (SECOND) OF CONTRACTS §§ 17, 22, 24, 35, 36, 38, 39).

¶ 25     Here, there certainly was not enough evidence to support the jury's finding that Plaintiffs had entered into a contract with Chrismos.  Vooys testified that she and Gerace had discussed with Defendants that they wanted a seven-year lease.  However, on March 1, 2004, six months after Plaintiffs had completed repairs to the restaurant, Defendants proffered a two-year lease to

---

[3] *See also Sutherland v. Sutherland*, 28 A.3d 1093, 1100 (Del. Fam. Ct. 2010); *Luke v. Gentry Realty, Ltd.*, 96 P.3d 261, 267 (Hawai'i 2004); *Kumberg v. Kumberg*, 659 P.2d 823, 831 (Kan. 1983); *Belanger v. Yorke*, 226 A.3d 215, 225 (Me. 2020); *Jordan Panel Sys., Corp. v. Turner Constr. Co.*, 45 A.D.3d 164 (N.Y. App. Ct. 2007); *Schwarz v. St. Jude Medical, Inc.*, 802 S.E.2d 783, 789 (N.C. Ct. App. 2017); *Bennet v. Heidinger*, 507 N.E.2d 1162, 1164 (Ohio Ct. App. 1986); *Kabil Devs. Corp. v. Mignot*, 566 P.2d 505, 507 (Or. 1977). *But see Fitzpatrick v. Vermont State Treasurer*, 475 A.2d 1074, 1077 (Vt. 1984) ("Although the terms 'agreement' and 'contract' do not precisely the same meaning, they are frequently used as exact synonymous.").

*Mosler et al. v. Gerace et al.*                    2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 12 of 37

Plaintiffs.[4] This lease had a per-month rent increase to $2,500, which was $1,000 more than what Plaintiffs were at that time paying each month. The lease was in Plaintiffs' individual names and not in the name of Barabus, Inc., their business entity. It made Plaintiffs responsible for all repairs and made them forego a jury trial should any issues arise. All of these terms were either not discussed or were incorrect; Plaintiffs believed that this lease was terrible. While the jury certainly could conclude that the parties had made an agreement—that Chrismos would provide a long-term lease if Plaintiffs made the requested repairs—the absence of any mutual assent to specific terms establishes, as a matter of law, that the parties had not formed a contract.[5]

¶ 26     But this does not end our analysis. Plaintiffs urge us to reinstate the jury verdict based on promissory estoppel, an alternate ground that was not pled in the complaint. They argue that the evidence in the record supports affirming the jury's verdict under a promissory estoppel theory. Defendants counter by stating that Plaintiffs did not plead promissory estoppel in their complaint and thus they cannot attempt to seek affirmance of the judgment under that new theory of liability. Defendants, however, are incorrect. Pursuant to Virgin Islands Rule of Civil Procedure 54(c), which was based on Federal Rule of Civil Procedure 54(c), a judgment that is not a default judgment "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." V.I. R. CIV. P. 54(c). That is, "a party is not bound by his

---

[4] The March 1, 2004 lease was not what the parties had discussed, a seven-year lease.

[5] Plaintiffs also argue that Defendants owed them duties of good faith and fair dealing and that these duties were breached. Because we conclude that there was no contract between the parties, there was no duty of good faith and fair dealing. A duty of good faith and fair dealing exists solely in the performance of a contract and in its enforcement. *See* RESTATEMENT (SECOND) OF TORTS, §205; *see also id.* cmt. c ("This Section . . . does not deal with good faith in the formation of a contract.") Here, a contract was not formed, and therefore Defendants could not have had a duty of good faith and fair dealing in their promise to provide a seven-year lease.

*Mosler et al. v. Gerace et al.*                    2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 13 of 37

prayer for relief but may receive such relief as the proof shows him to be entitled to." *Glen Falls Indem. Co. v. Golden*, 148 F.Supp. 41, 43 (D.D.C 1957). Therefore, if a plaintiff pleads breach of contract, and fails to prove the existence of a contract, but nevertheless introduces evidence which establishes the elements of some other cause of action that had not been pled—such as quantum meruit or promissory estoppel—the plain text of Rule 54(c) allows the court to enter judgment on that unpled cause of action. *See Electrical Const. & Maintenance Co., Inc. v. Maeda Pacific Corp.*, 764 F.2d 619, 622 (9th Cir. 1985) (affirming dismissal of breach of contract judgment for lack of consideration but permitting recovery for promissory estoppel even though promissory estoppel had not been pled). Here the pleadings and the evidence provided the Defendants with adequate notice of the elements and supporting proof for a promissory estoppel ground for relief as a natural implementation of the contractual claim.

¶ 27    Having decided that the jury's verdict for breach of contract could be sustained if Plaintiffs proved the elements of an unpled cause of action, we must now decide whether Plaintiffs did in fact establish the elements of promissory estoppel. However, this Court has neither recognized a cause of action for promissory estoppel, nor established the elements for such a cause of action. Consequently, we must conduct a *Banks* analysis on these questions as well.

¶ 28    We need not engage in a detailed analysis, however, because we are persuaded by the *Banks* analysis performed by the United States District Court of the Virgin Islands in *Whitaker v. Martin*, where it considered the three *Banks* factors regarding promissory estoppel to assist it in predicting whether this Court would recognize a cause of action for promissory estoppel. 2020 WL 7481783 (D.V.I. Dec. 18, 2020) (unpublished). As to the first factor, the District Court determined that few cases in the Virgin Islands had dealt with claims of promissory estoppel but that those cases that did address it, referenced § 90 of the Restatement (Second) of Contracts. *Id.*

*Mosler et al. v. Gerace et al.*     2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 14 of 37

at *4 (collecting cases). Section 90 provides that "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires." Next, the District Court determined that most of the other jurisdictions also followed the Restatement approach.[6] Finally, it found that the soundest rule was to follow the Restatement

---

[6] *See Branch Banking & Trust Co. v. Nichols*, 184 So.3d 337 (Ala. 2015); *Thomas v. Archer*, 384 P.3d 791 (Alaska 2016); *Higginbottom v. State*, 51 P.3d 972 (Ariz. Ct. App. 2002); *Holmes v. Potter*, 523 S.W.3d 397 (Ark. Ct. App. 2017); *Jones v. Wachovia Bank*, 179 Cal. Rptr.3d 21 (Cal. Ct. App. 2014); *Patzer v. City of Loveland*, 80 P.3d 908 (Colo. Ct. App. 2003); *Chotkowski v. State*, 690 A.2d 368 (Conn. 1997); *Fanean v. Rite Aid Corp. of Del., Inc.*, 984 A.2d 812 (Del. Super. Ct. 2009); *Kauffman v. Int'l Bhd. of Teamsters*, 950 A.2d 44 (D.C. 2008); *FCCI Ins. Co. v. Cayce's Excavation, Inc.*, 901 So.2d 248 (Fla. Dist. Ct. 2005); *Mitchell v. Ga. Dept. of Comty. Health*, 635 S.E.2d 798 (Ga. Ct. App. 2006); *Furuya v. Assoc. of Apartment Owners of Pacific Monarch, Inc.*, 375 P.3d 150 (Haw. 2016); *Profits Plus Capital Mgmt., LLC v. Podesta*, 332 P.3d 785 (Idaho 2014); *Centro Medico Panamericano, Ltd. v. Benefits Mgmt. Gr., Inc.*, 61 N.E.3d 160 (Ill. App. Ct. 2016); *Biddle v. BAA Indianapolis, LLC*, 860 N.E.2d 570 (Ind. 2007); *Kunde v. Estate of Bowman*, 920 N.W.2d 803 (Iowa 2018); *Templeton v. Kan. Parole Bd.*, 6 P.3d 910 (Kan. 2000); *Sawyer v. Mills*, 295 S.W.3d 79 (Ky. 2009); *Acurio v. Cage*, 257 So. 3d 824 (La. Ct. App. 2018); *Harvey v. Dow*, 962 A.2d 322 (Me. 2008); *Oliveira v. Sugarman*, 130 A.3d 1085 (Md. Ct. Spec. App. 2016); *Harrington v. Fall River Hous. Auth.*, 538 N.E.2d 24 (Mass. App. Ct. 1989); *McMath v. Ford Motor Co.*, 259 N.W.2d 140 (Mich. Ct. App. 1977); *Greuling v. Wells Fargo Home Mortg., Inc.*, 690 N.W.2d 757 (Minn. Ct. App. 2005); *Thompson v. First Am. Nat. Bank*, 19 So. 3d 784 (Miss. Ct. App. 2009); *Bauer Dev. LLC v. BOK Fin. Corp.*, 290 S.W.3d 96 (Mo. Ct. App. 2009); *S&P Brake Supply, Inc. v. STEMCO LP*, 385 P.3d 567 (Mont. 2016); *Hawkins Const. Co. v. Reiman Corp.*, 511 N.W.2d 113 (Neb. 1994); *Torres v. Nev. Direct Ins. Co.*, 353 P.3d 1203 (Nev. 2015); *Jackson v. Morse*, 871 A.2d 47 (N.H. 2005); *E. Orange Bd. of Educ. v. N.J. Schs. Const. Corp.*, 963 A.2d 865 (N.J. Super. Ct App. Div. 2015); *Magnolia Mountain Ltd., P'ship v. Ski Rio Partners, Ltd.*, 131 P.3d 675 (N.M. Ct. App. 2005); *Schroeder v. Pinterest Inc.*, 133 A.D.3d 12 (N.Y. App. Div. 2015); *Miller v. Walsh Cty. Water Res. Dist.*, 819 N.W.2d 526 (N.D. 2012); *Ford Motor Credit Co. v. Ryan*, 939 N.E.2d 891 (Ohio Ct. App. 2010); *Garst v. Univ. of Okla.*, 38 P.3d 927 (Okla. Civ. App. 2001); *Hills v. Mayers*, 802 P.2d 694 (Or. Ct. App. 1990); *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710 (Pa. Super. Ct. 2005); *Filippi v. Filippi*, 818 A.2d 608 (R.I. 2003); *N. Am. Rescue Prods., Inc. v. Richardson*, 769 S.E.2d 237 (S.C. 2015); *Canyon Lake Park, LLC v. Loftus Dental, P.C.*, 700 N.W.2d 729 (S.D. 2005); *Kinard v. Nationstar Mortg., LLC*, 572 S.W.3d 197 (Tenn. Ct. App. 2018); *Davis v. Texas Farm Bureau Ins.*, 470 S.W.3d 97 (Tex. App. 2015); *Cottonwood Imp. Dist. v. Qwest Corp.*, 296 P.3d 754 (Utah

*Mosler et al. v. Gerace et al.*　　　　　　　2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 15 of 37

"[g]iven both the Territory's previous reliance on the Second Restatement of Contracts as well as its continued use by the majority of the states." *Whitaker*, 2020 WL 7481783 at *4. We agree with this analysis and thus recognize a cause of action under the promissory estoppel theory when a plaintiff proves the following three elements: "(1) the promisor made a promise that he should have reasonably expected to induce action; (2) the promisee took action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise." *See* RESTATEMENT (SECOND) OF CONTRACTS § 90.

¶ 29　Applying this test to the case here, we conclude that Plaintiffs established all elements of promissory estoppel. Vooys testified that she and Gerace had discussed with Defendants that they wanted a seven-year lease. Defendants told Plaintiffs, however, that they would only receive a lease from Chrismos if they completed a list of repairs and improvements. Based on this promise, Plaintiffs started to work on improving the restaurant in the manner Defendants requested. They invested their time and money, sanding down the bar, painting the restaurant, and buying equipment and advertisements. Yet while Defendants knew Plaintiffs had requested and expected a seven-year lease, Defendants never offered them the seven-year lease that they wanted; nevertheless, Defendants received the benefit of the improvements and repairs. On these facts, Plaintiffs established the elements of a promissory estoppel cause of action.

¶ 30　One issue, however, remains: the damages Plaintiffs are entitled to receive for promissory estoppel. Although the jury had awarded $100,000 to Plaintiffs, it did so on their breach of contract claim, and not for promissory estoppel. Yet there may potentially be instances where a

---

Ct. App. 2013); *Taylor v. Nat'l Life Ins. Co.*, 652 A.2d 466 (Vt. 1993); *Mongold v. Woods*, 677 S.E.2d 288 (Va. 2009); *Clipse v. Commercial Driver Servs., Inc.*, 358 P.3d 464 (Wash. Ct. App. 2015); *Champine v. Milwaukee Cty.*, 696 N.W.2d 245 (Wis. Ct. App. 2005); *Singer v. Lajaunie*, 339 P.3d 277 (Wyo. 2014).

*Mosler et al. v. Gerace et al.*          2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 16 of 37

monetary judgment for an unproven but pleaded cause of action cannot be sustained based on a proven but unpled cause of action. This, however, is not such a case. This Court has previously held that "[a] plaintiff claiming a breach of contract has available and need not choose between three types of damages—actual, consequential, and benefit-of-the-bargain." *Robertson*, 2023 VI at ¶ 21 (quoting *Catroppa v. Metal Bldg. Supply, Inc.*, 267 S.W.3d 812, 817 (Mo. Ct. App. 2008)). Courts in other jurisdictions, however, have observed that the damages a plaintiff may recover in a promissory estoppel action may potentially be broader: while "[a] promissory estoppel claim generally entitles a plaintiff to the same damages available on a breach of contract claim," *State Ready Mix, Inc. v. Moffatt & Nichol*, 181 Cal.Rptr.3d 921, 926 (Cal. Ct. App. 2015), "the circumstances of the case" may entitle the plaintiff to recover other damages not necessarily traditionally awarded in breach of contract cases, such as for reputational harm, for the purpose of making the plaintiff whole. *See Tour Costa Rica v. Country Walkers, Inc.*, 758 A.2d 795, 802 (Vt. 2000). Here, because the jury awarded its $100,000 verdict for breach of contract based on the same evidence that sustains the promissory estoppel claim, and a successful promissory estoppel plaintiff is—at a minimum—entitled to the same damages for promissory estoppel as for breach of contract, this Court may simply reinstate the $100,000 verdict rather than remand the matter for a new trial for damages, given that Plaintiffs have not requested a damages award for promissory estoppel that exceeds the damages previously awarded for breach of contract.

   2.   Intentional Misrepresentation

¶ 31   Defendants argue that the Superior Court erred when it affirmed the jury's verdict on Plaintiffs' intentional misrepresentation claim. Defendants make three arguments in their brief as to why this Court should vacate the verdict on intentional misrepresentation. First, they argue that there "was never a promise to give Vooys and Gerace a lease with all of the terms they

*Mosler et al. v. Gerace et al.*                    2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 17 of 37

deemed acceptable, and there was no representation here they have could [sic] reasonably relied upon." (Defendants' Br. 18.)  Second, they argue that Plaintiffs failed to show a pecuniary loss because they personally did not incur a loss and that it was in fact Barabus, Inc. that incurred a loss.  Finally, Defendants argue that "there was no evidence that supported a finding that the alleged promises of seven-year lease were knowingly false when made."  (Defendants' Br. 20.)

¶ 32    Before addressing Defendants' issues, we must determine whether an intentional misrepresentation claim arises from contract or torts.  *See Love Peace v. Banco Popular de Puerto Rico*, 75 V.I. 284, 288-89. (V.I. 2021). In *Love Peace*, this Court explained that when a party "seeks only to rescind an underlying contract based on an alleged misrepresentation, entitlement to that relief is determined according to the law of contracts, but where the claimant seeks damages arising from the misrepresentation, such a claim sounds in torts, rather than contracts." *Id.* at 289 (citing *Wilkinson v. Wilkinson*, 70 V.I. 901, 908 (V.I. 2019)).  Here, Plaintiffs sought to recover damages, therefore the law of torts applies to their claim.[7]

¶ 33    To prevail in an intentional misrepresentation claim based on tort, a plaintiff is "required to demonstrate that (1) defendant misrepresented a material fact, opinion, intention, or law; (2) that [the defendant] knew or had reason to believe was false; (3) and was made for the purpose of inducing [plaintiff] to act or refrain from acting; (4) which [plaintiff] justifiably relied on; and (5)

---

[7] The Superior Court determined that the intentional misrepresentation claim sounded in tort because there was no agreement between the parties. However, it is not whether there is an agreement or not that governs which type of law applies, but what type of remedy a party is seeking.  This error is harmless as we determine above that the misrepresentation was in fact based on a tort. V.I. R. APP. R. 4(i); *see also Antilles Sch., Inc. v. Lembach*, 64 V.I. 400, 438 n.23 (V.I. 2016) ("It is well established that, under the right result, wrong reason doctrine, where the record otherwise supports the trial court's judgment, an appellate court may affirm that judgment for reasons other than those relied upon by the trial court, even if the trial court's reasons are erroneous.")

*Mosler et al. v. Gerace et al.*　　　　　　　　　2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 18 of 37

which caused [plaintiff] a pecuniary loss." *Love Peace*, 75 V.I at 291.

¶ 34　　As established above, Defendants did promise Gerace and Vooys that they would give Plaintiffs a long-term lease if Plaintiffs completed certain improvements and repairs to CBBBR. All that Defendants wanted was for the repairs and improvements to get done. There is also testimony from Mosler that a lease was not important to him. Additionally, Plaintiffs provided evidence that despite their requests for a seven-year long lease, it was never given to them. They also showed that when another potential tenant appeared, Defendants gave him a lease for seven years. This evidence shows that Defendants never really wanted or intended to give Gerace and Vooys a long-term lease, despite explicitly agreeing to do so if Plaintiffs completed the contemplated improvements and repairs: initially, replacing screens and sinks, painting the outside of the restaurant, resurfacing the bar and doing a general cleanup; and subsequently, fixing the damages to the CBBBR kitchen and restaurant caused by the incorrectly-sized ventilation hood over the kitchen stove.

¶ 35　　This promise of a seven-year lease was more than adequate, in fact, to induce Plaintiffs to act. The evidence showed that Plaintiffs were eager to get a lease. Defendants knew that Gerace and Vooys would act in order to get the lease as Plaintiffs bought the restaurant for $50,000 and wanted to stay to get a return on their investment. Finally, the evidence showed that Plaintiffs lost money because they invested money in order to fix and improve the restaurant.[8] Vooys

---

[8] Defendants argue that Plaintiffs did not suffer a pecuniary loss because it was their company, Barabus, Inc., that in fact spent the money in repairing the restaurant. Assuming that we agree, we find that the Superior Court properly allowed the evidence of the expenses incurred by Barabus. When the shareholder of an S corporation "is so actively engaged in the company's day-to-day operations that he is akin to the entity's alter ego, an S corporation may be treated differently from a C Corporation." *Bova v. Gary*, 843 N.E.2d 952, 958 (Ind. Ct. App. 2006). Here, Barabus is an S corporation, meaning that Gerace and Vooys are the sole shareholders; they

*Mosler et al. v. Gerace et al.* 2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 19 of 37

testified that Plaintiffs had spent over $40,000 in repairs, over $20,000 in equipment and $50,000 in promotions and advertising. On the facts in the present record, this Court affirms the Superior Court's decision to uphold the jury's verdict as to the intentional misrepresentation claim.

### 3. Defamation

¶ 36 Plaintiffs argue, on several grounds, that the Superior Court erred in vacating the jury's verdict on the claim for defamation. "In the Virgin Islands, a claim of defamation requires: (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Espersen*, 76 V.I. at 614 (citing *Kendall v. Daily News Pub. Co.*, 55 V.I. 781, 787 (V.I. 2011)). We address each claim with respect to each defendant.

#### a. Hanley

¶ 37 The Superior Court determined that there was no evidence that Hanley had defamed either Vooys or Gerace, on the ground that Plaintiffs failed to link any purportedly defamatory statement to Hanley. We agree. Vooys testified that "Mosler started like a smear campaign on why he was getting rid of us on the radio and TV." (J.A. 1032.) She never mentioned any statements made by Hanley. John Woodson testified that he never heard Hanley on the radio. Michael Belcheff testified to only hearing Mosler on the radio but not Hanley. And John Reed, the bartender, testified about Mosler going on the radio show. While Hanley did admit to going on the Roger Morgan show and that he stated that Plaintiffs were not current with the rent, this statement was

---

are also the president and vice president respectively and, as such, are the primary decision makers. Plaintiffs worked on improving CBBBR, constantly trying to fix it to meet Defendants' expectations. Thus, Gerace and Vooys are essentially Barabus's alter ego and the expenses incurred by Barabus can serve to represent the losses Gerace and Vooys incurred.

*Mosler et al. v. Gerace et al.*                    2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 20 of 37

true as Plaintiffs went to pay the outstanding rent after Hanley was on the show.  On this record, the Superior Court correctly vacated the jury's verdict against Hanley for defamation.

### b.  Mosler

¶ 38     The Superior Court set aside the defamation verdicts against Mosler on two different grounds.  It found that one statement—that Plaintiffs did not know how to run a restaurant—constituted an unactionable opinion and determined that all other statements attributable to Mosler were true.[9]  Specifically, the Superior Court determined to be true Mosler's statements that (1) Plaintiffs were always late with rent, (2) that Plaintiffs borrowed $150,000 from family, (3) that Defendants had reduced Plaintiffs' rent, and (4) that drugs were around the property.

¶ 39     As noted above, a statement must be false to constitute defamation, and opinions and true

---

[9] In their appellate brief, Plaintiffs first claim that the Superior Court improperly vacated the jury's defamation verdict against Mosler because the court vacated that verdict based on grounds that were not raised in Defendants' pre-verdict Rule 50(a) motion and were therefore waived.  We agree.  In *Charles v. Payne*, we determined that when an argument is not raised in a pre-verdict Rule 50(a) motion, it cannot be raised in a post-verdict motion for judgment as a matter of law. 71 V.I. 638, 648-49 (V.I. 2019).  Although Mosler made a pre-verdict motion, he failed to argue in that pre-verdict motion that the statements made by him were merely his opinion and not actionable.  Rather, Mosler only argued that the statements were true, that Plaintiffs failed to show special harm, and that Plaintiffs made themselves public figures by thrusting themselves into the limelight.  While the issue of whether a statement is an opinion is a matter of law that a court must review *de novo* without any deference to the finder of fact, *Simpson v. Andrew L. Capdeville, P.C.*, 64 V.I. 477, 486 (V.I. 2016), the fact that an issue is reviewed de novo does not excuse a party's failure to preserve the issue for such review.  *See Fischer v. Fischer*, 348 S.W.3d 582, 590 (Ky. 2011) ("Ultimately, it is the responsibility of the movant to put the legal ground before the court, because it is, after all, his motion, and he bears the burden of proof and persuasion. . . . While it is correct that [the issue] is reviewed de novo . . . such review is limited to the question of interpretation presented.").  Therefore, the Superior Court erred when it vacated the jury's defamation verdict against Mosler on grounds that the statements constituted an unactionable opinion, when Mosler failed to properly preserve such a claim.  *See Gatz v. Otis Ford, Inc.*, 691 N.Y.S.2d 113, 114 (N.Y. App. Div. 1999) (holding that defense that statements which gave rise to defamation judgment were pure opinions is unpreserved for appellate review if not properly preserved in the trial court).  Nevertheless, because we conclude that all Mosler's statements must be interpreted together to ascertain his liability for defamation, we exercise our discretion to overlook this waiver and consider the claim on the merits.

*Mosler et al. v. Gerace et al.*          2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 21 of 37

statements thus are not calculated to form the basis for defamation liability because they are not provably false. *Espersen*, 76 V.I. at 614. But this does not necessarily mean that true statements cannot be defamatory, because "in certain circumstances even a technically true statement can be so constructed as to carry a false and defamatory meaning by implication or innuendo." *Martin v. Hearst Corp.*, 777 F.3d 546, 552 (2d Cir. 2015). As the Second Circuit explained,

> The classic example of defamation by implication is [a case] in which a newspaper reported that a woman, upon arriving at the home of another woman and finding her own husband there "first fired a shot at her husband and then at the other woman, striking her in the arm." The article neglected to mention, however, the additional facts that several neighbors and the husband of the other woman were also present, that all were sitting together in the living room talking, and that the shooting was accidental. Even though the statements in the article were all technically true, the article falsely implied that the husband and the other woman had been shot at because they were caught in an adulterous affair and had become targets of an enraged wife—a meaning both false and defamatory.

777 F.3d at 552-53 (citing *Memphis Publishing Co. v. Nichols*, 569 S.W.2d 412 (Tenn. 1978)) (internal citations and quotation marks omitted).

¶ 40 The same is true of statements framed as opinions. In reaching the conclusion that an opinion can never be defamatory, the Superior Court placed heavy emphasis on language in our decision in *Simpson v. Andrew L. Capdeville, P.C.*, stating that "hyperbole and expressions of opinion are typically not provable as false, and therefore not actionable," 64 V.I. 477, 486 (V.I. 2016), concluding that "saying that someone does not know how to run a business is an opinion and could never be defamatory." (J.A. 99.) But this Court in *Simpson* did not establish a *per se* rule that opinions may never give rise to defamation liability: we said that "expressions of opinion are <u>typically</u> not provable as false." 64 V.I. at 488 (emphasis added). "This Court has adopted the basic elements for a claim of defamation set forth in the Second Restatement of Torts." *Joseph v. Daily News Pub. Co.*, 57 V.I. 566, 585-86 (V.I. 2012) (*citing Kendall v. Daily News Pub. Co.*,

*Mosler et al. v. Gerace et al.*  2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 22 of 37

55 V.I. 781, 787 (V.I. 2011)). The Second Restatement expressly provides that

> A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory fact as the basis for the opinion.

RESTATEMENT (SECOND) OF TORTS § 566.  The comments to this Restatement provision further clarify that "if the recipient draws the reasonable conclusion that the derogatory opinion expressed in the comment must have been based on undisclosed defamatory facts, the defendant is subject to liability." *Id.* at cmt. c.  As one court has succinctly summarized, "[t]he bottom line is [that] protected opinion exists if the reader is in as good a position as the author to judge whether the conclusion is correct." *Loftus v. Nazari*, 21 F.Supp.3d 849, 853 (E.D. Ky. 2014) (collecting cases).

¶ 41    The evidence in the present case, when viewed in the light most favorable to Plaintiffs, was sufficient for a rational jury to conclude that Mosler's statements were collectively false, even if some may have been technically true.  People who heard Mosler's statements about Plaintiffs and their restaurant on the radio were certainly not "in as good a position" as Mosler "to judge whether the conclusion [was] correct," *Loftus*, 21 F.Supp.3d at 853—Mosler was, after all, not just a successful businessman, but also one of the two owners of Chrismos, the entity that leased the property to Plaintiffs.  Mosler's statements, when viewed in this context, establish an intent to defame Plaintiffs.  Mosler's statement that Plaintiffs did not know how to run a restaurant—while nominally an opinion—must be considered together with his statements that (1) Plaintiffs were always late with rent, (2) that Plaintiffs borrowed $150,000 from family, (3) that Defendants had reduced Plaintiffs' rent, and (4) that drugs were around the property.  While Plaintiffs were sometimes late with rent—calculated by the Superior Court as being late 42.86% of the time—they were not always late with rent, or even late most of the time.  Although Plaintiffs

*Mosler et al. v. Gerace et al.*          2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 23 of 37

received $45,000 from their family, they did not borrow $150,000. At no point did Defendants ever reduce Plaintiffs' rent. Nor was any evidence introduced by anyone at trial which provided even a hint that drugs had ever been on the premises, let alone that Mosler had reason to know there were drugs there—on the contrary, several witnesses described the restaurant as clean.

¶ 42      All the above statements, when read together and not analyzed in isolation divorced from context, would lead the radio audience to believe that Plaintiffs were essentially insolvent, having borrowed $150,000 from family yet never being able to pay rent on time, even after rent had been reduced.[10] A listener would also give enhanced credence to Mosler's claim that drugs were on the property, given that Mosler essentially served as Plaintiffs' landlord, and could also reasonably conclude that Plaintiffs were turning a blind eye to—or even participating in—drug sales at the restaurant due to their seeming insolvency. It also transforms what otherwise might be a protected statement of opinion—that Plaintiffs did not know how to run a business—into a defamatory statement, in that it implies that Plaintiffs got to the point where they are severely in debt, unable to ever pay rent on time despite having their rent reduced, and permitted drugs in their restaurant due to their own bad business decisions as opposed to other factors, such as the fact that the restaurant had been closed for two months due to a fire, or that Plaintiffs had spent money on repairs and renovations they did not wish to make but paid for anyway because Defendants made them a precondition to receiving a long-term lease that was never offered. Accordingly, the evidence was sufficient to sustain the verdict on this claim, and we reinstate the jury's verdict on the defamation cause of action with respect to Mosler.

---

[10] In fact, the emphasis that $150,000 had been borrowed from family enhances the impression that Plaintiffs were insolvent, in that it necessarily implies that Plaintiffs may not have been creditworthy enough to obtain a loan from a legitimate financial institution and had to seek assistance from family instead.

*Mosler et al. v. Gerace et al.*                    2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 24 of 37

4. Punitive Damages

¶ 43    Plaintiffs further argue that the Superior Court erred in vacating the jury's punitive damages award for lack of sufficient evidence.  Plaintiffs also argue that the Superior Court inappropriately reweighed the evidence.

¶ 44    "Punitive damages are damages awarded in cases of serious or malicious wrongdoing to punish or deter the wrongdoer or deter others from behaving similarly." *Cornelius*, 67 V.I. at 824 (internal quotation marks omitted). "Punitive damages must be based upon conduct that is not just negligent but shows, at a minimum, reckless indifference to the person injured  conduct that is outrageous and warrants special deterrence." *Id.* (collecting cases).  "Plaintiffs must . . . prove their entitlement to punitive damages by clear and convincing evidence."  *Espersen*, 76 V.I. at 629. When determining whether there is sufficient evidence to support the jury's award, "[t]his Court must consider the evidence in the light most favorable to [Plaintiffs], including giving [them] the benefit of all reasonable inferences to be drawn from that proof. *Id.* at 630 (citing *Chestnut v. Goodman*, 59 V.I. 467, 475 (V.I. 2013)).

¶ 45    Because we uphold the Superior Court's decision to vacate the jury's verdict on the defamation claim against Hanley, we need to determine whether there was sufficient evidence to reinstate the punitive damages award against Hanley based on the intentional misrepresentation claim.  When assessing the sufficiency of the evidence, we consider the evidence in the light most favorable to Plaintiffs.  This includes the benefit of all reasonable inferences to be drawn from that proof. *Chestnut*, 59 V.I. at 475.  The Superior Court concluded that the evidence only showed that Defendants misled Plaintiffs into thinking they would get a long-term lease, and that it was Mosler who made most of the misrepresentations, not Hanley.

¶ 46    We agree.  The record reflects that Hanley seemed to have an amicable relationship with

*Mosler et al. v. Gerace et al.*          2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 25 of 37

Plaintiffs.  He frequented the restaurant, assisted Plaintiffs in trying to get a better deal in the sale to Jordan, agreed with Plaintiffs that the proposed March 1, 2004 lease was terrible and offered to help them get a better one.  We cannot say that Hanley's conduct was so outrageous or done with reckless indifference such as to warrant a punitive damages award.  For these reasons, we affirm the Superior Court's decision to vacate the punitive damages award against Hanley.

¶ 47    We cannot say the same, however, with respect to the punitive damage award against Mosler.  As mentioned above, punitive damages can be awarded when the conduct is so reckless or outrageous that it warrants special deterrence.  *Cornelius*, 67 V.I. at 824.  At trial, Plaintiffs established that Mosler essentially began a smear campaign against Plaintiffs with the intention to tarnish their reputations to such an extent that they could no longer have a successful business and would have no choice but to sell it to Jordan, Mosler's preferred purchaser.  This, standing alone, constitutes more than a sufficient basis for a punitive damages award.  *See, e.g., Sprague v. Walter*, 656 A.2d 890, 923 (Pa. Super. Ct. 1995) (affirming punitive damages award where evidence established that defendant engaged in a "smear campaign" to "destroy [the plaintiff's] career").  However, Mosler's conduct is even more outrageous when we consider that Virgin Islands law vested him with <u>legal</u> means to attain his desired result, such as by initiating a forcible entry and detainer action predicated on nonpayment of rent, *see* 28 V.I.C. § 281 et seq., yet Mosler nevertheless chose to forego those legal means in favor of waging a defamation campaign.  Accordingly, we reinstate the jury's punitive damages award against Mosler.

## C.  Closing Arguments

¶ 48    Defendants argue that the trial court erred in denying their motion for a new trial based on Plaintiffs' attorney's alleged misconduct during closing arguments. Defendants raise three issues: (1) that the closing arguments were inflammatory when Plaintiffs' attorney referred to Mosler

*Mosler et al. v. Gerace et al.*          2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 26 of 37

wanting a "white, middle-class restaurant"; (2) that Plaintiffs' attorney improperly testified as a witness; and (3) that Plaintiffs' attorney misrepresented evidence to the jury.

¶ 49    Plaintiffs counter by arguing that Defendants' attorney failed to contemporaneously object to all of these statements and that review is therefore waived. In *R.J. Reynolds Tobacco Co. v. Gerald*, this Court stated that when reviewing a motion for a new trial based on an attorney's misconduct, we look at whether the conduct was improper and whether it was prejudicial in the context of the entire trial. 76 V.I. 657, 680-81 (V.I. 2022). We review for abuse of discretion when a contemporaneous objection is sustained and the party then moves for a mistrial. *Id.* at 681-82. A party can also preserve an argument if the Superior Court definitively denies a motion *in limine*. *See Davis v. Varlack Ventures, Inc.*, 59 V.I. 229, 233 n.1 (V.I. 2013) ("[T]he denial of the motion *in limine* alone is sufficient to preserve [an] issue for appeal because the motion *in limine* 'specifically raised the evidentiary issues' presented to [the Supreme Court], and the Superior Court definitely ruled on the motion before trial."). However, when there is no contemporaneous objection or denial of a motion for mistrial, this Court reviews for plain error. *R.J. Reynolds,* 76 V.I. at 682-83.

¶ 50    We agree with Plaintiffs that Defendants waived most of their claims on these issues. Defendants failed to contemporaneously object to any of the complained-of statements. While Defendants state that this Court did not decide in *Espersen* or *R.J. Reynolds* whether an objection must be made after each offending statement, this Court has already determined that a contemporaneous objection means just that: an objection that occurs concurrently with the statement that is believed to be objectionable. For instance, in *R.J. Reynolds*, we looked at whether each distinct statement that was being complained of on appeal was objected to or not. *See, e.g., id.* at ¶¶ 31-45. *See also John Cheeseman Trucking, Inc. v. Dougan*, 853 S.W.2d 278

*Mosler et al. v. Gerace et al.*            2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 27 of 37

(Ark. 1993); *R.J. Reynolds Tobacco Co. v. Townsend*, 90 So. 3d 307 (Fla. Dist. Ct. App. 2012); *Dagne v. Schroeder*, 783 S.E.2d 426 (Ga. App. 2016); *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Dorsey*, 730 N.W.2d 17 (Mich. Ct. App. 2006).[11]

¶ 51    Therefore, we review the only claim that Defendants did preserve: Plaintiffs' attorney's reference to Mosler wanting a "white, middle-class restaurant."  The Superior Court had denied Mosler's motion based upon these statements, determining that the statements could be relevant to reflect Mosler's motive as to why he did not want to give Plaintiffs a lease.  The court also stated that "[d]efendants [were] free to argue against the relevance that race played in [Mosler's] actions with all the arguments developed in their motion and reply during trial." (J.A. 124.)  The Superior Court definitively denied the motion and thus the issue was preserved for appeal.

¶ 52    We disagree that counsel's reference to a "white, middle-class restaurant" so inflamed the jury so as to warrant a new trial.  "Using some degree of emotionally charged language during closing arguments in a civil case is a well-accepted tactic in American courtrooms." *Settlegoode v. Portland Pub. Sch.,* 371 F.3d 503, 518 (9th Cir. 2004). However, such arguments must not be so inflammatory that they "divert the jury's attention from its duty to decide the case on the evidence." *DeSilvia*, at 55 V.I.  872; *see also New York Cent. R. Co. v. Johnson*, 279 U.S. 310, 318 (1929). But while Plaintiffs' attorney did refer to Mosler wanting Plaintiffs to leave the restaurant because he wanted a white, middle-class restaurant, there was evidence introduced at

---

[11] This is not a new practice in the Virgin Islands.  The United States Court of Appeals for the Third Circuit when reviewing cases from the Virgin Islands has stated since the 1970s that a contemporaneous objection is required during closing arguments to avoid plain error review. *See e.g. Herman v. Hess Oil V.I. Corp.*, 12 V.I. 240, 248 (3d Cir. 1975); *Dunn v. Hovic*, 28 V.I. 467, 474-75 (3d Cir. 1993).

*Mosler et al. v. Gerace et al.*                              2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 28 of 37

trial that Mosler made this statement to Vooys and Gerace. There was also testimony from Gary Anthony, a patron of CBBBR, that the clientele changed when Plaintiffs left, with Anthony testifying that there were "less locals." (J.A. 986-87.) Because an evidentiary basis existed for Plaintiff's counsel to make these statements, we find that the argument was proper.[12]

¶ 53    Other than the reference to the "white, middle-class restaurant," Defendants failed to contemporaneously object to the any of the other statements made in Plaintiffs' closing argument that they now challenge on appeal. Thus we review the effect of these statements only for plain error. When plain error exists, this Court will determine whether the error, though affecting a substantial right, seriously affected "fairness, integrity, or public reputation of the judicial proceeding," thus warranting reversal. *Cornelius,* 67 V.I. at 816–17.

¶ 54    First, Defendants argue that Plaintiffs' attorney improperly testified during initial closing argument. Plaintiffs' attorney read a letter she sent to Defendants and then stated: "It is [Plaintiffs'] position that there was promise made to them to enter into a two-year lease – that's my mistake, I misunderstood because I had seen one of the leases . . ." (J.A. 1850.) While it may be unusual for an attorney to read a statement made in a letter written by her fifteen years earlier, the April 20, 2005 letter had been admitted into evidence at trial and constituted part of the record. Therefore, we discern no error in permitting counsel to read from it as part of closing argument.

¶ 55    Defendants also contend that Plaintiffs' attorney committed misconduct when she told the jury "that had they had a lease, had there been a promise for that maintained, we know from Miss Alex Myers, they could have sold the lease, like Mr. Jordan did, for $125,000," J.A. 1856, when

---

[12] Even if it was an error to allow this argument, we would not find it was prejudicial. Plaintiffs' attorney referred to the white, middle-class restaurant about four times in an hour-long initial closing argument. *See Whittenburg v. Werner Enters. Inc.*, 561 F.3d 1122, 1130 (10th Cir. 2009). This is not so pervasive as to warrant a new trial.

*Mosler et al. v. Gerace et al.*                         2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 29 of 37

the $125,000 figure had only been allowed as impeachment evidence. Impeachment evidence can be commented upon during closing argument, but only when it goes to the credibility of a witness and not a main issue in the case. *See Drake v. Caterpillar Tractor Co.*, 474 N.E.2d 291, 294 (Ohio 1984) (finding that a new trial was warranted because the jury used impeachment evidence to decide main issue in case). We thus agree that Plaintiffs' counsel should not have referenced the sum of $125,000 that Myers paid as part of the damages that could be awarded in the case. However, we can discern no way in which this isolated reference infringed upon Defendants' substantial rights, given that the jury only awarded $100,000 to Plaintiffs on the relevant count.

¶ 56     Defendants also argue that Plaintiffs' attorney misrepresented multiple facts in her rebuttal closing arguments. Among these were statements about: (1) Vooys adding a notation to a $2,000 rent check; (2) Plaintiffs intending to leave because there was no lease; (3) Defendants evicting Plaintiffs; and (4) Defendants not producing a witness.[13]

¶ 57     "[T]he cardinal rule of closing argument [is] that counsel must confine comments to evidence in the record and to reasonable inferences from that evidence." *James v. People*, 59 V.I. 866, 888 (V.I. 2013) (quoting *United States v. Lopez-Medina,* 596 F.3d 716, 740 (10th Cir. 2010)). Defendants are correct that the first two cited statements misconstrue evidence adduced at trial, and that the last two statements misconstrued the law. However, the record reflects that the Superior Court issued curative instructions with respect to these issues in its final jury instructions. "When a jury is given an instruction, including a curative instruction, the

---

[13] Defendants also challenge a statement with respect to whether CBBBR had been open in June 2005. But as the Superior Court stated, there was conflicting testimony as to whether they were open, and attorneys are given latitude in presenting evidence in the best light to their clients. *See James v. People*, 59 V.I. 866, 888 (V.I. 2013) ("The purpose of closing argument is to mold the facts given during trial in the light most favorable to one's client.").

*Mosler et al. v. Gerace et al.*          2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 30 of 37

presumption is that the jury will follow the instruction." *Monelle v. People*, 63 V.I. 757, 770 (2015) (citing *Francis v. People,* 59 V.I. 1075, 1080 (V.I. 2013); *Ostalaza v. People,* 58 V.I. 531, 555 (V.I. 2013)). Consequently, these statements, although improper, were not prejudicial, and certainly not so prejudicial as to constitute plain error. Therefore, we conclude that the Superior Court committed no error in denying Defendants' motion for a new trial.

### D. Prejudgment Interest & Failure to Enter Judgment

¶ 58    Plaintiffs argue that they are entitled to prejudgment interest on the compensatory damages awarded to them on their breach of contract and intentional misrepresentation claims[14] pursuant to title 11, section 951(a) of the Virgin Islands Code, yet the Superior Court failed to award prejudgment interest when it ultimately entered judgment. Defendants argue that Plaintiffs waived their entitlement to prejudgment interest by failing to request it in the joint final pretrial order as to Defendants and, in the alternative, that the damages were allegedly not ascertainable.

¶ 59    We first consider whether Plaintiffs waived their entitlement to prejudgment interest. Defendants argue that this Court stated in *Vlaun v. Briscoe*, 2022 VI 18, ¶19 that a party can waive prejudgment interest if that form of recovery is not asserted. While it is true that Plaintiffs failed to mention it in the joint final pretrial order, Plaintiffs did assert an entitlement to prejudgment interest in their complaint, and in their motion to enter judgment. *See Indemnity Ins. Co. of N. Am. v. Guidant Mut. Ins. Co.*, 99 So.3d 142, 157 (Miss. 2012) (holding that the party requesting prejudgment interest may demand it in its complaint); *Dixie Bell, Inc. v. Redd*, 656 S.E.2d 765 (S.C. Ct. App. 2007) (discussing that prejudgment interest may be pled in complaint). Therefore, we conclude that, having asserted a claim for prejudgment interest in the complaint, Plaintiffs did

---

[14] Plaintiffs do not claim an entitlement to prejudgment interest on the compensatory damages awarded on their defamation claim, nor to the portion of the award representing punitive damages.

*Mosler et al. v. Gerace et al.*        2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 31 of 37

not waive their entitlement to prejudgment interest.

¶ 60    Having found that Plaintiffs did not waive their entitlement to prejudgment interest, we turn to the question whether section 951(a) entitles Plaintiffs to prejudgment interest on the damages awarded. Plaintiffs assert that their entitlement to prejudgment interest began to run from March 1, 2004, the date that Plaintiffs assert that Defendants provided them with a lease agreement that did not provide for a seven-year lease term. There are only two provisions of section 951(a) that could possibly warrant an award of prejudgment interest in this case: section 951(a)(1) authorizing such interest on "all monies which have become due," and section 951(a)(4), providing for interest on "money due or to become due where there is a contract and no rate is specified."

¶ 61    We conclude, however, that neither provision is applicable, at least with respect to the period prior to the jury rendering its verdict on March 3, 2022. We previously recognized that "interest on monies owed but not paid is a necessary component of the damages incurred for breach of contract due to the time value of money, in that money in hand today is worth more than the same amount of money received at some future date because it can be invested and reap the benefits of compound interest." *Vlaun*, 2022 VI, ¶ 19 (collecting cases). But as explained above, there was no contract between Plaintiffs and Defendants that Defendants breached— rather, Defendants are liable to Plaintiffs only on theories of promissory estoppel and intentional misrepresentation. In this context, section 951(a)(4) cannot authorize a prejudgment interest award.

¶ 62    Section 951(a)(1), of course, differs from section 951(a)(4) in that it does not expressly require a contract. Thus, we recently concluded that section 951(a)(1) "is broader than similar statutes in other states limiting prejudgment interest to contractual damages only." *R.J. Reynolds*,

*Mosler et al. v. Gerace et al.* 2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 32 of 37

76 V.I. at 736. Nevertheless, "[t]he mere fact that a jury has determined an award does not mean it is automatically 'money due'" dating back to the time of the alleged wrongful conduct that gave rise to the defendant's liability. *Id.* at ¶ 134. Rather, we held that section 951(a)(1) only permits interest on "ascertainable sums," i.e., monetary damages for claims that were liquidated. *R.J. Reynolds*, 76 V.I. at 726.

¶ 63    We agree with Defendants that the compensatory damages in this case were not readily ascertainable on March 1, 2004, or any other date prior to the March 3, 2022 jury verdict. As a threshold matter, Plaintiffs acknowledge in their brief that at least some of the damages awarded by the jury were for "building good will" and "Plaintiffs' sweat equity." (Appellees' Br. 42.) These damages, however, are intangible and unliquidated, and thus cannot qualify for prejudgment interest under section 951(a)(1), at least with respect to any periods before announcement of the jury verdict. *R.J. Reynolds*, 76 V.I. at 736. But while some aspects of the compensatory damages award—such as $40,000 for repairs, $20,000 for equipment—may arguably be ascertainable, we agree with the courts that have held that to qualify for prejudgment interest on a claim the entire amount in controversy must be ascertainable, with litigants not entitled to partial prejudgment interest when one portion of the damages for a cause of action is ascertainable but the plaintiff also seeks, and successfully recovers, other unascertainable damages. *See, e.g., Winston v. Guelzow*, 855 N.W.2d 432, 437 (Wisc. Ct. App. 2014) (holding no entitlement to partial prejudgment interest for a $33,300 debt that the defendant did not contest, when the plaintiff had sought and recovered other damages against the defendant on the same claim that were not ascertainable).

¶ 64    But this does not mean, however, that Plaintiffs possess no entitlement to any interest for any period prior to the September 13, 2022 judgment. As noted above, the jury rendered its

*Mosler et al. v. Gerace et al.*          2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 33 of 37

verdict on March 3, 2022, and conclusively determined the extent of Defendants' liability to Plaintiffs, as well as the specific monies that Defendants owed Plaintiffs. Consequently, the previously unliquidated monies owed by Defendants to Plaintiffs all became liquidated—and thus ascertainable—when the jury announced its verdict on March 3, 2022. *See, e.g., Rogers v. City of Kennewick,* 2007 WL 9759254, at *4 (E.D. Wash. Aug. 15, 2007) ("Prejudgment interest is recoverable on liquidated damages. . . . In this case, the damages became liquidated when the jury rendered its verdict, therefore the date prejudgment interest began to run was the date of the verdict. . . The Court awards prejudgment interest on the amount of the verdict to the date of the judgment. Plaintiffs are entitled to post-judgment interest from the date of the judgment."); *Zeigler v. Goelzer*, 211 N.W. 140, 144 (Wisc. 1964) (awarding postverdict, pre-judgment interest for a tort claim accruing from the date of the initial jury verdict rather than the date of final judgment, despite an appeal and a new trial on an issue unrelated to damages, because the tort damages "became liquidated" and ascertainable when the jury announced its verdict); *Kent v. Chapel*, 70 N.W. 2, 3 (Minn. 1897) ("In the case at bar the claim for damages became liquidated and determined by the verdict. There was no further uncertainty about the claim.").

¶ 65     This, of course, would be true with respect to any civil case tried before a jury. And in a typical case, that the damages become ascertainable upon the announcement of the jury verdict is merely academic: Rule 58(b) of the Virgin Islands Rules of Civil Procedure requires that entry of judgment on a jury verdict occur "promptly," and title 5, section 426 of the Virgin Islands Code provides that "[t]he rate of interest on judgments and decrees for the payment of money shall be 4 percent per annum." 5 V.I.C. § 426(a). Thus, when the Superior Court complies with the edicts of Civil Rule 58(b) and promptly enters a judgment on the jury verdict on the same day or the next day, the amount of prejudgment interest accrued at the 9 percent rate pursuant to section

*Mosler et al. v. Gerace et al.*　　　　　　　　　2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 34 of 37

951(a)(1) for the fleeting period between announcement of the jury verdict and entry of judgment on the verdict should be either zero or *de minimis*.

¶ 66　In this case, however, the Superior Court failed to enter judgment "promptly," electing to enter judgment on the verdict more than six months later, on September 13, 2022, despite both the plain text of Civil Rule 58(b) and the Plaintiffs even filing motions for entry of judgment. Because the March 3, 2022 jury verdict established that Defendants were liable to Plaintiffs for a specific monetary amount, and judgment was not entered until September 13, 2022, Plaintiffs were entitled to postverdict prejudgment interest at the 9 percent per annum rate pursuant to section 951(a)(1) for the period from March 3, 2022, through September 13, 2022.

¶ 67　In making this holding, we are cognizant of two potential arguments against requiring postverdict prejudgment interest for this period.  It is certainly true that Plaintiffs could not execute on the jury verdict until and unless the Superior Court entered judgment based on the verdict.  *See* 5 V.I.C. § 471 (providing for a judgment for the payment of money to be enforced by writ of execution). However, section 951(a)(1) permits prejudgment interest on "all monies which have become due," without requiring that such monies be collectable by writ of execution or other judicial process. The reason for that is because imposing such a requirement would literally render section 951(a)(1) a complete nullity since its purpose is to provide for prejudgment interest, yet prejudgment interest could never be awarded in any case since no debt, no matter how ascertainable, can be judicially enforced prior to entry of a judgment. *Accord, R.J. Reynolds*, 76 V.I. at 736 (declining to interpret section 951 in a way that would require an award of prejudgment interest prior to verdict in every single case).

¶ 68　Likewise, we find unpersuasive the reasons the Superior Court set forth in its July 25, 2022 order denying Plaintiffs' motion to enter judgment. The Superior Court justified its refusal

*Mosler et al. v. Gerace et al.*                    2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 35 of 37

to enter judgment by stating that

> the Court still has under consideration the [Defendants'] Post-Trial Rule 50(b) and Rule 59(a) Motion. Entering judgment would implicitly deny the [Defendants'] motions, might constitute an abuse of discretion, and would likely cause further delay and invite additional costs and expense if [Defendants] simply refiled their motions after judgment had been entered. Moreover, if the motion for a new trial were granted, it would require vacating the judgment that [Plaintiffs'] want entered.

(J.A. 118.)   This, however, constitutes a misinterpretation of Civil Rule 58(b) that is wholly inconsistent with our prior precedents interpreting that rule.  As we previously explained, not only does Civil Rule 58(b) obligate a judge to promptly sign the judgment, but "[t]he Judges and Clerk of the Superior Court are without discretion in this matter." *World Fresh Markets, LLC v. Henry*, 71 V.I. 1161, 1180 (V.I. 2019).  Moreover, entry of judgment pursuant to Civil Rule 58(b) cannot possibly constitute an implicit denial of a post-judgment motion filed pursuant to Civil Rules 50(b) or 59(a) because a post-judgment motion cannot take effect until *after the entry of the judgment it pertains to*.  We held in *Charles v. Payne* that the limitations period for filing a motion under Civil Rules 50(b) or 59(a) does not commence until the Superior Court enters judgment under Civil Rule 58(b).  71 V.I. 638, 645 (V.I. 2019).  Thus, when Defendants filed their renewed motion for judgment as a matter of law on March 22, 2022, they elected to do so before the start of the limitations period set forth in Civil Rules 50(b) and 59(a), since the deadline to file such a motion did not begin to run until September 13, 2022, when the Superior Court later filed the judgment.[15] *See id.*   Consequently, entry of judgment would not have implicitly denied

---

[15] Defendants argue that their renewed motion took effect on March 22, 2022, because it addressed a jury issue not determined by the verdict.  They stated that they raised issues other than those decided by the verdict, such as the denial of their motion *in limine*, the impropriety of counsel's closing argument, the gist of the action doctrine and liability of LLC members. (Defendants' Rep. Br. 28-29.)  However, Defendants are misconstruing the rule.  Civil Rule 50(b)

*Mosler et al. v. Gerace et al.*               2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 36 of 37

Defendants' motion, nor would it have required Defendants to file their motion again, as the Superior Court suggests. To the extent the Superior Court was concerned with Defendants paying a judgment that might be changed by its determination of the post-judgment motions, Rule 62 of the Virgin Islands Rules of Civil Procedure provided it with a mechanism to stay execution of the judgment. *See* REPORTER'S NOTE, V.I. R. CIV. P. 62 ("Under subpart (b) the court may stay the execution of a judgment – or any proceedings to enforce it – pending the disposition of any of the specified post-trial motions, upon proper security.") Therefore, we conclude that the Superior Court erred when it declined to enter judgment promptly in accordance with Civil Rule 58(b), and that the effect of that error is that postverdict prejudgment interest accrued for the approximately six-month period from the announcement of the jury verdict on March 4, 2022, and the eventual entry of judgment on September 13, 2022.[16]

### III. CONCLUSION

¶ 69     This Court agrees with the Superior Court that there was no contract between the parties, but because we nevertheless find that Plaintiffs introduced sufficient evidence to prevail on their claim for the same damages under a theory of promissory estoppel, we reverse that portion of the September 13, 2022 opinion and order vacating the damages awarded by the jury for breach of

---

states that "if the motion addresses a jury issue not decided by a verdict," it should be filed no later than 28 days after the jury is discharged. The issues that the motion raised were not jury issues, but issues that needed to be decided by the court.

[16] As outlined earlier, not all portions of the jury's March 4, 2022 verdict remain valid in light of the subsequent decisions of this Court and the Superior Court. Moreover, as also noted earlier, Plaintiffs have not claimed an entitlement to any prejudgment interest on their defamation claim or the punitive damages award. Consequently, on remand the Superior Court shall calculate postverdict prejudgment interest for the period from March 4, 2022, to September 13, 2022, only based on the portion of the jury verdict that has not been set aside and for which Plaintiffs have requested prejudgment interest.

*Mosler et al. v. Gerace et al.* 2024 VI 1
S. Ct. Civ. No. 2022-0049
Opinion of the Court
Page 37 of 37

contract.  We also affirm the portions of the Superior Court's decision which set aside the jury awards on the claims for defamation and punitive damages as to Hanley, and which upheld the jury's verdict and award as to the intentional misrepresentation claim.  We, however, conclude that the Superior Court erred in vacating the jury's verdict in favor of Plaintiffs on the defamation claim with respect to Mosler, as well as the award of punitive damages as to Mosler, and therefore vacate those portions of the September 13, 2022 opinion and order and reinstate those portions of the jury verdict.  And while we find that the Superior Court properly denied the motion for a new trial, we conclude that it erred in failing to award prejudgment interest for the compensatory damages awarded on the claims for breach of contract (recharacterized as promissory estoppel) and intentional misrepresentation for the period stemming from March 3, 2022, through September 13, 2022.  Accordingly, we affirm in part and reverse in part the September 13, 2022 opinion and order, and remand the case to the Superior Court to calculate the amount of postverdict prejudgment interest owed to Plaintiffs.

**Dated this 3rd day of January, 2024.**

                          **BY THE COURT:**

                          /s/ Rhys S. Hodge
                          **RHYS S. HODGE**
                          **Chief Justice**

**ATTEST:**

**VERONICA J. HANDY, ESQ.**
**Clerk of the Court**

**By:**      /s/ Reisha Corneiro
      **Deputy Clerk II**

**Dated**:    January 3, 2024